THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MAVERICK GAMING LLC,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>          Defendants. | No. 22-cv-05325 DGE<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>ORAL ARGUMENT REQUESTED<br><br>NOTE ON MOTION CALENDAR:  November 4, 2022 |

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF MATERIAL FACTS ....................................................................... 2

LEGAL STANDARD ................................................................................................... 6

BACKGROUND ........................................................................................................... 6

    I.     Statutory Scheme ............................................................................... 6

          A.     Indian Gaming Regulatory Act ............................................ 6

          B.     The Johnson Act and Other Federal Laws ............................ 8

          C.     Washington Law and Compacts .............................................. 8

    II.    Maverick ........................................................................................... 11

ARGUMENT ............................................................................................................... 13

    I.     The Constitution's Guarantee Of Equal Protection Forbids Granting Tribal Casinos A Monopoly Over Class III Gaming ........................................ 13

          A.     Limiting class III gaming to Indian tribes constitutes racial discrimination and is therefore subject to strict scrutiny .......................... 13

          B.     Washington's tribal monopoly cannot survive strict scrutiny ................. 17

          C.     Even if strict scrutiny did not apply, Washington's naked protectionism for a favored class lacks a rational basis ........................... 18

    II.    IGRA Does Not Allow States To Create A Tribal Monopoly Over Class III Gaming ......................................................................................... 20

          A.     IGRA's text imposes a state-permission requirement .............................. 21

          B.     Neighboring provisions confirm that class III tribal gaming is allowed only if it is permitted for non-tribal entities ............................... 22

          C.     Congress's purpose in passing IGRA was to create parity between tribal and non-tribal gaming ........................................................... 24

          D.     Even if IGRA were ambiguous, the canon of constitutional avoidance requires reading it to avoid the serious constitutional questions that a tribal monopoly raises .................................................... 25

    III.   IGRA's State-Negotiation Mandate Violates The Anti-Commandeering Principle ........................................................................................... 26

CONCLUSION ............................................................................................................ 29

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1

**TABLE OF AUTHORITIES**

2

CASES

3

*Adarand Constructors, Inc. v. Peña,*
    515 U.S. 200 (1995) ....................................................................................13, 17

4

5

*Adoptive Couple v. Baby Girl,*
    570 U.S. 637 (2013) ...................................................................................16

6

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ................................................................................27, 28

7

8

*Amador Cnty. v. Salazar,*
    640 F.3d 373 (D.C. Cir. 2011) ...............................................................27

9

10

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) ....................................................13, 16, 19, 20, 25

11

*Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n,*
    14 F.3d 633 (D.C. Cir. 1994) ..................................................................25

12

13

*California v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987) ..........................................................................6, 21, 23

14

*Cheyenne River Sioux Tribe v. South Dakota,*
    3 F.3d 273 (8th Cir. 1993) .....................................................................23

15

16

*Chickasaw Nation v. United States,*
    534 U.S. 84 (2001) .................................................................................25

17

18

*Citizen Band of Potawatomi Indian Tribe of Okla. v. Green,*
    995 F.2d 179 (10th Cir. 1993) ...............................................................21

19

*City & Cnty. of San Francisco v. United States,*
    130 F.3d 873 (9th Cir. 1997) .................................................................6

20

21

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) ...............................................................11

22

23

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) ...............................................................................18

24

*Craigmiles v. Giles,*
    312 F.3d 220 (6th Cir. 2002) .................................................................18

25

26

*Duncan v. Walker,*
    533 U.S. 167 (2001) ...............................................................................21

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
  485 U.S. 568 (1988)..................................................................................24

*Fisher v. Univ. of Tex. at Austin,*
  570 U.S. 297 (2013)..................................................................................18

*Gratz v. Bollinger,*
  539 U.S. 244 (2003)..................................................................................18

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
  861 F.3d 944 (9th Cir. 2017) ...................................................................12

*Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony,*
  538 U.S. 701 (2003)..................................................................................22

*Keweenaw Bay Indian Cmty. v. United States,*
  136 F.3d 469 (6th Cir. 1998) ................................................................7, 24

*KG Urban Enters., LLC v. Patrick,*
  693 F.3d 1 (1st Cir. 2012)........................................................................17

*Mashantucket Pequot Tribe v. Connecticut,*
  913 F.2d 1024 (2d Cir. 1990)...................................................................28

*Merrifield v. Lockyer,*
  547 F.3d 978 (9th Cir. 2008) ...................................................................19

*Montana v. Blackfeet Tribe of Indians,*
  471 U.S. 759 (1985)..................................................................................25

*Morton v. Mancari,*
  417 U.S. 535 (1974)............................................................................14, 15

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  138 S. Ct. 1461 (2018).........................................................................26, 28

*Nat'l Mining Ass'n v. Zinke*
  877 F.3d 845 (9th Cir. 2017) ...................................................................28

*Nationwide Mut. Ins. Co. v. Darden,*
  503 U.S. 318 (1992)..................................................................................21

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
  508 U.S. 656 (1993)..................................................................................12

*New Mexico v. Dep't of Interior,*
  854 F.3d 1207 (10th Cir. 2017) ..........................................................26, 28

iii

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Nixon v. Mo. Mun. League,*
    541 U.S. 125 (2004) .......................................................................................22

*N. Arapaho Tribe v. Wyoming*
    389 F.3d 1308 (10th Cir. 2004) ....................................................................28

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) .......................................................................................17

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.,*
    946 F.3d 1100 (9th Cir. 2020) ...............................................................11, 12

*Powers v. Harris,*
    379 F.3d 1208 (10th Cir. 2004) ....................................................................19

*Printz v. United States,*
    521 U.S. 898 (1997) ................................................................................26, 27

*Rice v. Cayetano,*
    528 U.S. 495 (2000) ...............................................................14, 15, 16, 17

*Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,*
    602 F.3d 1019 (9th Cir. 2010) ......................................................................26

*Robers v. United States,*
    572 U.S. 639 (2014) .......................................................................................22

*Rumsey Indian Rancheria of Wintun Indians v. Wilson,*
    64 F.3d 1250 (9th Cir. 1994) ........................................................................23

*Rust v. Sullivan,*
    500 U.S. 173 (1991) .......................................................................................24

*S. Cal. Darts Ass'n v. Zaffina,*
    762 F.3d 921 (9th Cir. 2014) ..........................................................................6

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1995) .........................................................................................27

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ........................................................................12

*St. Joseph Abbey v. Castille,*
    712 F.3d 215 (5th Cir. 2013) ........................................................................18

*Tafoya v. City of Albuquerque,*
    751 F. Supp. 1527 (D.N.M. 1990) .........................................................16, 18

iv

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA 98020
(425) 967-3550

*Taxpayers of Mich. Against Casinos v. State*,
   685 N.W.2d 221 (Mich. 2004)............................................................21

*W. Flagler Assocs. v. Haaland*,
   2021 WL 5492996 (D.D.C. Nov. 22, 2021) ..................................................12

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*,
   439 U.S. 463 (1979)............................................................17, 21

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*,
   443 U.S. 658 (1979)............................................................14

*Williams v. Babbitt*,
   115 F.3d 657 (9th Cir. 1997) ......................................14, 15, 17, 24, 25

*Wisconsin v. Ho-Chunk Nation*,
   784 F.3d 1076 (7th Cir. 2015) ................................................24

**STATUTES**

5 U.S.C. § 706(2)(A)............................................................6

5 U.S.C. § 706(2)(C)............................................................6

5 U.S.C. § 706(2)(E)............................................................6

15 U.S.C. § 1175(a) ............................................................8, 23

18 U.S.C. § 1166(a) ............................................................8, 22

18 U.S.C. § 1955(a) ............................................................8

25 U.S.C. § 2701(5)............................................................23

25 U.S.C. § 2703............................................................22

25 U.S.C. § 2703(6)............................................................7

25 U.S.C. § 2703(7)............................................................7

25 U.S.C. § 2703(8)............................................................7

25 U.S.C. § 2710(a)(1)............................................................7

25 U.S.C. § 2710(b)(1) ............................................................7

25 U.S.C. § 2710(b)(1)(A)............................................................22

25 U.S.C. § 2710(d)(1)............................................................8, 20, 21

v

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

25 U.S.C. § 2710(d)(1)(A) ...........................................................................................7

25 U.S.C. § 2710(d)(1)(B) .........................................................................7, 20, 21, 22, 24

25 U.S.C. § 2710(d)(1)(C) ....................................................................................7, 21

25 U.S.C. § 2710(d)(3)(A) ..................................................................................23, 26

25 U.S.C. § 2710(d)(3)(B) ........................................................................................4

25 U.S.C. § 2710(d)(5) ...........................................................................................19

25 U.S.C. § 2710(d)(6) ......................................................................................8, 23

25 U.S.C. § 2710(d)(8)(A) ........................................................................................4

25 U.S.C. § 2710(d)(8)(B)(ii) .................................................................................27

25 U.S.C. § 2721 ...................................................................................................27

33 U.S.C. § 1362(4)–(5) ........................................................................................22

42 U.S.C. § 300f(10) .............................................................................................22

42 U.S.C. § 300f(12) .............................................................................................22

42 U.S.C. § 6903(13) .............................................................................................22

42 U.S.C. § 6903(15) .............................................................................................22

RCW 9.46.220(3) ....................................................................................................9

RCW 9.46.220–.222 ............................................................................................2, 3

RCW 9.46.221(3) ....................................................................................................9

RCW 9.46.222 ........................................................................................................8

RCW 9.46.222(3) ....................................................................................................9

RCW 9.46.225 ........................................................................................................3

RCW 9.46.0237 ..................................................................................................2, 8

RCW 9.46.0269 ......................................................................................................2

RCW 9.46.0269(1) ..................................................................................................8

RCW 9.46.0269(1)(a)–(c) .......................................................................................9

vi

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

RCW 9.46.0305–.0361 ...................................................................................2, 9

RCW 9.46.360 .........................................................................................2, 3, 10

RCW 9.46.360(2) ...............................................................................................10

RCW 9.46.360(3) ...............................................................................................10

RCW 9.46.360(4) ...............................................................................................10

RCW 9.46.360(6) ...............................................................................................10

RCW 9.46.360(9) ...............................................................................................10

RCW 9.46.0364 ...................................................................................................2

RCW 9.46.0364(1) ...............................................................................................3

RCW 9.46.0364(2) ...............................................................................................3

2020 Wash. Legis. Serv. ch. 127 .........................................................................3

## REGULATIONS

25 C.F.R. § 83.11(e) ...........................................................................................13

86 Fed. Reg. 49,046 (Sept. 1, 2021) ....................................................................4

86 Fed. Reg. 51,370 (Sept. 15, 2021) ..................................................................4

86 Fed. Reg. 58,685 (Oct. 22, 2021).....................................................................4

86 Fed. Reg. 73,800 (Dec. 28, 2021) ....................................................................4

87 Fed. Reg. 35,992 (June 14, 2022) ....................................................................4

87 Fed. Reg. 39,866 (July 5, 2022) .......................................................................4

## RULES

Fed. R. Civ. P. 56(a) ...........................................................................................6

## OTHER AUTHORITIES

134 Cong. Rec. 24,027 (1988) (statement of Senator McCain) ..........................24

*Administrative Orders*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/4t759k6h...................................................9

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Annual Report – 2019 Fiscal Year*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/yc7d72zu ...............................................................5

*Casino Locations*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/58czhnwk ..............................................................4

*Enrollment FAQ*, Confederated Tribes of the Colville Reservation,
    *available at* https://tinyurl.com/mjwxaym6.............................................................13

First Amendment to the Tribal/State Compact for Class III Gaming Between the Confederated
    Tribes of the Colville Reservation and the State of Washington, (Mar. 30, 2007),
    *available at* https://tinyurl.com/mpnmxkhp..............................................................4

*Gaming Compacts*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/5n6eacrb ..............................................................3, 4

*Illegal Activities*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/5x5j5ayb ..............................................................9

S. Rep. No. 100-446 (1988) .........................................................................................6, 24

*Submit a Tip*, Wash. State Gambling Comm'n,
    *available at* https://tinyurl.com/k7fcz26s ..............................................................9

Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated
    Tribes of the Colville Reservation and the State of Washington (July 6, 2021),
    *available at* https://tinyurl.com/4vhe7sjb ..............................................................3, 4

Transcript of Oral Argument, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1995) (No. 94-
    12), 1995 WL 606007 ..........................................................................................27

*Tribal Community Contributions*, Wash. State Gambling Comm'n (May 12, 2022),
    *available at* https://tinyurl.com/mwyn6zz4 ..............................................................5

Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the
    State of Washington (Aug. 2, 1991),
    *available at* https://tinyurl.com/2urbfu2c ..............................................................2

viii

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1

## **INTRODUCTION**

2      Casino gaming is a lucrative industry.  In 2019 alone, Washington's gambling industry

3   generated almost $3.5 billion in net gambling receipts.  The lion's share of that revenue—more

4   than $2.9 billion—came from tribal casinos, which offer patrons an array of options ranging from

5   sports betting to roulette to dealer-assisted electronic table games.  Maverick Gaming LLC

6   ("Maverick"), a non-tribal cardroom operator, wants to expand its Washington operations to offer

7   those types of games to its patrons and effectively compete in Washington's casino gaming market.

8      Under Washington law, however, Maverick is restricted from entering this market because

9   it is not a tribal entity.  Washington criminalizes most forms of casino-style gaming for non-tribal

10  entities but allows tribal casinos to offer those games under tribal-state compacts.  Washington has

11  thereby created a tribal monopoly over this multi-billion-dollar industry.  Maverick, along with

12  every other non-tribal entity, is shut out of the market.

13     Washington's grant of a tribal monopoly over an entire sector of its economy is

14  unconstitutional and violates federal law governing tribal gaming regulation.  States retain

15  considerable leeway in how they regulate commercial casino gaming—they may adopt broad bans

16  like Utah, embrace it wholeheartedly like Nevada, or fall in the middle like Colorado.  What they

17  may not do, however, is allow Indian tribes to offer casino gambling but criminalize it for everyone

18  else.  That approach violates the Constitution's guarantee of equal protection and contravenes the

19  detailed scheme that Congress set out in the Indian Gaming Regulatory Act ("IGRA").

20  Additionally, IGRA itself violates the anti-commandeering doctrine by ordering states to negotiate

21  with Indian tribes over gaming compacts.  Maverick brought this suit to vindicate its right to

22  compete on an equal footing with tribal casinos, and it is entitled to judgment as a matter of law.

23

24

25

26

1

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

## STATEMENT OF MATERIAL FACTS

Pursuant to LCR 56.1, Maverick contends that no genuine issue exists with respect to the following facts:

1.      Maverick is a Washington limited liability company that owns and operates 18 cardrooms in Washington.  *See* Declaration of Eric Persson in Support of Plaintiff's Motion for Summary Judgment ("Persson Decl.") ¶¶ 2–3.  Maverick seeks to expand its gaming offerings in Washington to include additional games such as roulette, craps, sports betting, and dealer-assisted electronic table games.  *Id.* ¶ 4.  Maverick has identified economically viable opportunities to expand its Washington operations if doing so were legally permitted.  *Id.* ¶ 5.

2.      Washington allows tribal casinos—and tribal casinos alone—to offer these forms of gaming within the State.  *See, e.g.*, RCW 9.46.0237, 9.46.0269, 9.46.0305–.0361, 9.46.0364, 9.46.220–.222, 9.46.360.  But for Washington's tribal monopoly, Maverick is able, ready, and prepared to expand its gaming operations in Washington to include roulette, craps, sports betting, and dealer-assisted electronic table games, as well as other casino-style games.  *See* Persson Decl. ¶ 6.  Maverick has access to the capital needed to finance a class III gaming operation in Washington and to purchase the necessary facilities and equipment.  *Id.* ¶ 7.  Maverick has conducted market analysis, identified suitable locations, contracted with vendors and business partners who could service the Washington market, and studied Washington's gaming laws.  *Id.* ¶ 8.  Maverick has the necessary background and experience in class III gaming activities to offer class III games in the Washington market.  *Id.* ¶ 9.

3.      Purporting to act pursuant to IGRA—a federal scheme regulating gaming on Indian lands—Washington entered into its first tribal-state compact with the Tulalip Tribes of Washington on August 2, 1991.  That compact authorized the Tulalip Tribes of Washington to conduct a wide range of class III games that are illegal for non-tribal entities to offer, including roulette and craps.  *See* Tribal-State Compact for Class III Gaming Between the Tulalip Tribes of Washington and the State of Washington at 4–5 (Aug. 2, 1991), *available at* https://tinyurl.com/2urbfu2c.

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

4.      Since 1991, Washington has entered into analogous compacts with "[a]ll 29 federally recognized tribes in Washington," giving the Tribes the exclusive right to offer certain class III games such as craps and roulette.  *Gaming Compacts*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5n6eacrb.

5.      On March 25, 2020, Washington passed a new law, S.H.B. No. 2638, giving Indian tribes in the state a monopoly over sports betting.  *See* 2020 Wash. Legis. Serv. ch. 127.  It remains a crime for non-tribal entities to offer sports betting.  *See* RCW 9.46.220–.222.

6.      The new act states that "[u]pon the request of a federally recognized Indian tribe or tribes in the state of Washington, the tribe's class III gaming compact may be amended … to authorize the tribe to conduct and operate sports wagering on its Indian lands … .  Sports wagering conducted pursuant to the gaming compact is a gambling activity authorized by this chapter."  RCW 9.46.0364(1).  The statute makes clear that "[s]ports wagering conducted pursuant to the provisions of a class III gaming compact entered into by a tribe and the state pursuant to RCW 9.46.360 is authorized bookmaking and is not subject to civil or criminal penalties pursuant to RCW 9.46.225."  *Id.* § 9.46.0364(2).

7.      So far, 18 of the 29 federally recognized Indian tribes in Washington have executed Compact Amendments to permit the Tribes to offer sports betting at their gaming facilities.  *See, e.g.*, Third Amendment to the Tribal-State Compact for Class III Gaming Between Confederated Tribes of the Colville Reservation and the State of Washington (July 6, 2021) (hereinafter "Colville Compact Amendment"), *available at* https://tinyurl.com/4vhe7sjb.[1]

8.      These Tribes include the following: the Confederated Tribes of the Colville Reservation; the Cowlitz Indian Tribe; the Jamestown S'Klallam Tribe; the Kalispel Tribe; the Lummi Nation; the Muckleshoot Indian Tribe; the Puyallup Tribe of Indians; the Shoalwater Bay Indian Tribe; the Snoqualmie Indian Tribe; the Spokane Tribe; the Squaxin Island Tribe; the

---

[1]  Because the terms of each sports-betting amendment are materially identical, the Colville Compact Amendment is used for reference throughout this motion.

3

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Stillaguamish Tribe of Indians; the Suquamish Tribe; the Swinomish Indian Tribal Community; and the Tulalip Tribes of Washington.

9.    The Secretary of the U.S. Department of the Interior ("Secretary") has approved these compact amendments pursuant to IGRA.  *See* 86 Fed. Reg. 49,046, 49,046–47, 49,049–54 (Sept. 1, 2021); 86 Fed. Reg. 51,370, 51,370, 51,373–74 (Sept. 15, 2021); 86 Fed. Reg. 58,685 (Oct. 22, 2021); 86 Fed. Reg. 73,800 (Dec. 28, 2021); 87 Fed. Reg. 35,992 (June 14, 2022); 87 Fed. Reg. 39,866 (July 5, 2022).  Those approvals purport to authorize Washington's tribal sports-betting monopoly.  *See* 25 U.S.C. § 2710(d)(3)(B), (8)(A).

10.    The Compact Amendments add "Sports Wagering" to the list of class III gaming activities that the Tribes are permitted to offer, subject to a new Appendix S prescribing certain conditions.  Colville Compact Amendment at 2.

11.    The Compact Amendments require each of the Tribes to contribute their share of a "Start-Up Costs fee," which "includes the actual costs incurred by the State Gaming Agency for negotiations, rule development, regulatory program development, training, and similar activities necessary to implement Sports Wagering."  Colville Compact Amendment at 3.

12.    The Compact Amendments also provide that the Tribes' sports-betting net win will be included in the Tribes' total net gaming revenues, of which the Tribes are required to pay 0.13% to Washington for "problem gambling education, awareness, and treatment in the State of Washington."  Colville Compact Amendment, Appendix S, § 8.1; First Amendment to the Tribal/State Compact for Class III Gaming Between the Confederated Tribes of the Colville Reservation and the State of Washington, Appendix X2, §§ 14.4, 14.6 (Mar. 30, 2007), *available at* https://tinyurl.com/mpnmxkhp.

13.    The Tribes currently operate 29 casinos on Indian lands in Washington.  *See Casino Locations*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/58czhnwk.  Of these 29 casinos, 23 are governed by compacts that Washington and the Tribes have amended to permit sports betting.  *Id.*; *Gaming Compacts*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5n6eacrb.

4

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

14.     These casinos offer a range of class III games that are illegal for non-tribal entities to offer in Washington, including roulette, craps, sports betting, and dealer-assisted electronic table games (among other games).

15.     In 2019, Washington's entire gambling industry generated $3.462 billion in net gambling receipts. *See Annual Report – 2019 Fiscal Year* at 8, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/yc7d72zu.  The Tribes' net class III gaming receipts generated approximately $2.93 billion of those receipts.  *See Tribal Community Contributions* at 11–12, Wash. State Gambling Comm'n (May 12, 2022), *available at* https://tinyurl.com/mwyn6zz4.  The Tribes' net receipts were approximately $2.75 billion in 2018 and approximately $2.56 billion in 2017.  *See id.*

16.     There are no non-tribal casinos in Washington that offer the full range of class III games that Washington permits tribal casinos to offer.  No non-tribal casinos in Washington offer roulette, craps, sports betting, or dealer-assisted electronic table games.

17.     Maverick competes with other casinos, including tribal casinos, to offer the best and most attractive selection of games allowed by law.  Because the Tribes can offer class III games (including roulette, craps, sports betting, and dealer-assisted electronic table games), but Maverick cannot, Maverick incurs increased expenses and lost revenue, including: increased advertising expenses; increased promotional expenses; increased entertainment expenses; and lost revenue from customers who would frequent Maverick's cardrooms if Maverick offered the class III games that it is currently prohibited from offering, but who instead frequent tribal casinos. Maverick also suffers a loss of goodwill by failing to offer the same set of products as its tribal competitors.  If Maverick were able to offer the same games as tribal casinos—or if tribal casinos were limited to the same games as Maverick's existing cardrooms—Maverick would be able to compete more effectively and increase the revenue from its Washington cardrooms.  *See* Persson Decl. ¶¶ 10–14; Ex. A to the Declaration of Jonathan Chavez in Support of Plaintiff's Motion for Summary Judgment ("Chavez Decl.") ("Ex. A").

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014). "A dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

In reviewing a motion for summary judgment challenging agency action under the Administrative Procedure Act ("APA"), "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted). A court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

## BACKGROUND

### I.     Statutory Scheme

#### A.     Indian Gaming Regulatory Act

The Indian Gaming Regulatory Act was Congress's response to a Supreme Court decision that created disuniformity between tribal and non-tribal gaming operations. In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that California could not enforce its generally applicable gaming regulations against Indians on Indian lands within the State. Congress, the Court reasoned, had not consented to any such exercise of state jurisdiction over Indian gaming. *See id.* at 207. Dissatisfied with the uneven regulatory landscape that *Cabazon* produced, Congress passed IGRA the next year to "foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied" and to promote "free market competition" between state-licensed gaming operators and Indian tribes. S. Rep. No. 100-446, at 6, 13 (1988).

6

IGRA divides gaming into three classes. "Class I gaming" includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Its regulation on Indian lands is left "within the exclusive jurisdiction of the Indian tribes." *Id.* § 2710(a)(1). "Class II gaming" includes bingo and a limited set of non-banked card games (*i.e.*, games in which players compete against each other rather than against the house). *Id.* § 2703(7). Class II gaming is allowed on Indian lands if those lands are "located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)" and if "the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman" of the National Indian Gaming Commission. *Id.* § 2710(b)(1).

"Class III gaming"—the kind at issue here—includes "all forms of gaming that are not class I gaming or class II gaming," including many of the games typically found in casinos (such as blackjack, roulette, and craps). 25 U.S.C. § 2703(8). Class III gaming is lawful on Indian lands only if three conditions are met. *First*, the gaming activities must be "authorized by an ordinance or resolution" that "is adopted by the governing body of the Indian tribe having jurisdiction over such lands," "meets the requirements of subsection (b)"—*i.e.*, the rules governing class II gaming—and "is approved by the Chairman." *Id.* § 2710(d)(1)(A). *Second*, the gaming activities must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). *Third*, the gaming activities must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." *Id.* § 2710(d)(1)(C).

In line with IGRA's goal of promoting regulatory uniformity, the second requirement—the "state-permission requirement"—maintains parity between Indian tribes and non-tribal entities by conditioning the lawfulness of tribal gaming on the lawfulness of non-tribal gaming in the state. *See Keweenaw Bay Indian Cmty. v. United States*, 136 F.3d 469, 473 (6th Cir. 1998) (IGRA

7

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

"provides that tribes are entitled to engage in all forms of Class III gaming that a state permits for other citizens").

**B.    The Johnson Act and Other Federal Laws**

Unless IGRA's three conditions are satisfied, federal law criminalizes class III gaming on Indian lands.  IGRA itself states that class III gaming on Indian land is lawful "only if" § 2710(d)(1)'s conditions are met.  Additionally, the Johnson Act prohibits "any gambling device … within Indian country," 15 U.S.C. § 1175(a), and IGRA waives application of the Johnson Act only if class III gaming is "conducted under a Tribal-State compact that—(A) is entered into under paragraph (3) by a State in which gambling devices are legal, and (B) is in effect," 25 U.S.C. § 2710(d)(6).  Other provisions of federal law prohibit operating "an illegal gambling business," 18 U.S.C. § 1955(a), and make "all State laws pertaining to the licensing, regulation, or prohibition of gambling" applicable to non-IGRA-compliant gaming in Indian country "in the same manner and to the same extent as such laws apply elsewhere in the State," *id.* § 1166(a).

**C.    Washington Law and Compacts**

It is illegal to offer most forms of gaming in Washington.  Washington makes it a crime to engage in "professional gambling," *see, e.g.*, RCW 9.46.222, which Washington defines to include: (1) unless acting as a player or in a manner authorized by law, "engag[ing] in conduct which materially aids any form of gambling activity"; (2) unless acting in a manner authorized by law, "pay[ing] a fee to participate in a card game, contest of chance, lottery, or other gambling activity"; (3) unless acting as a player or in a manner authorized by law, "knowingly accept[ing] or receiv[ing] money or other property pursuant to an agreement or understanding with any person whereby he or she participates or is to participate in the proceeds of gambling activity"; (4) "engag[ing] in bookmaking"; (5) "conduct[ing] a lottery"; or (6) offering wagering on greyhound races, *id.* § 9.46.0269(1).[2]    Washington law specifies three degrees of illegal

---

[2]  Washington defines "gambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in

"professional gambling."  Depending on the scale of the gaming operation, a person offering unauthorized gaming may be guilty of a gross misdemeanor, *id.* § 9.46.222(3), a class C felony, *id.* § 9.46.221(3), or a class B felony, *id.* § 9.46.220(3).

Because Washington's definition of "professional gambling" excepts from its definition activities "authorized by this chapter," RCW 9.46.0269(1)(a)–(c), a business may offer gaming only if that form of gaming is expressly authorized by Washington law.  *See also Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5x5j5ayb ("Gambling in Washington is illegal unless the activity is specifically authorized by state law.").  Washington permits non-tribal entities to offer only limited types of gaming, such as raffles, bingo, card games, amusement games, pull-tabs, punchboards, sports pool boards, and fundraising events. RCW 9.46.0305–.0361.  None of these statutory exceptions authorizes non-tribal entities to engage in the full range of casino-style gaming in Washington.  As a result, it is a crime in Washington for non-tribal entities to offer the vast majority of class III games, including roulette, craps, and sports betting.

The threat of prosecution hangs over anyone who violates Washington's criminal gambling prohibitions, and Washington has made clear that it will not hesitate to make good on that threat. The Washington State Gambling Commission warns on its website:  "Gambling in Washington is illegal unless the activity is specifically authorized by state law. … Conducting illegal gambling activities may result in criminal charges being filed against you, your organization and/or its officers, and forfeiture of all property or money associated with the illegal gambling."  *Illegal Activities*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/5x5j5ayb.  The Commission also provides a form for people to "submit a tip regarding illegal [gambling] activities occurring in Washington," and the form includes a field for "[b]usiness [n]ame."  *Id.*; *Submit a Tip*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/k7fcz26s.  And the Commission routinely prosecutes enforcement actions against unlawful gambling operations.  *See*

---

the event of a certain outcome."  RCW 9.46.0237.

9

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Administrative Orders*, Wash. State Gambling Comm'n, *available at* https://tinyurl.com/4t759k6h (collecting administrative orders).

Tribal casinos, however, are not subject to these criminal prohibitions. Since the early 1990s, Washington has authorized tribal casinos located within the State to conduct a wide range of class III games. Washington codified its process for negotiating tribal-state class III gaming compacts pursuant to IGRA in 1992. RCW 9.46.360. Under that process, the director of the Washington State Gambling Commission (or the director's designee) "shall negotiate compacts for class III gaming on behalf of the state with federally recognized Indian tribes in the state of Washington." *Id.* § 9.46.360(2). After reaching a tentative agreement with an Indian tribe on a proposed compact, "the director shall immediately transmit a copy of the proposed compact to all voting and ex officio members of the gambling commission" and to the two standing committees designated by the Washington House of Representatives and Senate, each of which shall "forward its respective comments to the gambling commission." *Id.* § 9.46.360(3), (5).[3] Within 45 days of receiving a proposed compact from the director, the gambling commission, including the four ex officio members, "shall vote on whether to return the proposed compact to the director with instructions for further negotiation or to forward the proposed compact to the governor for review and final execution." *Id.* § 9.46.360(6). Washington law also empowers the gambling commission to "enforce the provisions of any compact between a federally recognized Indian tribe and the state of Washington." *Id.* § 9.46.360(9).

As explained in Maverick's Statement of Material Facts, *see supra* ¶¶ 3–9, Washington has entered into gaming compacts with all 29 federally recognized Indian tribes in the State, giving them the exclusive right to offer most forms of class III gaming, and, pursuant to a 2020 law, has entered into compact amendments with 18 tribes giving them the exclusive right to offer sports betting in the State, all of which have been approved by the Secretary and are now in effect.

---

[3] The four ex officio members of the gambling commission are voting members for the sole purpose of voting on proposed tribal-state compacts. RCW 9.46.360(4).

10

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

## II.     Maverick

Maverick, a non-tribal gaming company, owns and operates cardrooms in Washington. Because of Washington's tribal monopoly over class III gaming, however, Maverick is shut out from competing in that multi-billion-dollar market.  Even for Maverick's existing cardrooms, Washington's tribal monopoly requires Maverick to incur increased advertising expenses, increased promotional expenses, and increased entertainment expenses in order to better compete with the tribal casinos' expanded gaming offerings, and Maverick loses revenue from customers who would frequent Maverick's cardrooms if they offered the class III games that they are currently prohibited from offering.  Maverick also suffers a loss of goodwill by failing to offer the same set of products as its tribal competitors.  But for Washington's tribal monopoly, Maverick is able and ready to offer class III games at its existing facilities.

Maverick commissioned a survey of its customers, which confirmed that "Maverick Gaming has already lost revenue as a result of not having access to sports betting, and that access to sports betting and Class III gaming would result in incremental gaming revenue for Maverick Gaming."  Ex. A at 11.  76% of Maverick's customers who had placed an in-person sports bet in Washington stated that they would have placed their bet at one of Maverick's properties—rather than the tribal casino they went to—if Maverick offered sports betting.  *Id.* at 9.  28% of Maverick's total player base stated that they would spend additional money at Maverick's properties to engage in sports betting if Maverick offered it.  *Id.* at 10.  And 27% of Maverick's total player base indicated that they would spend additional money at Maverick's properties to play other class III games like crap and roulette if Maverick offered them.  *Id.*  So, were it not for Washington's tribal class III gaming monopoly, some of Maverick's customers would spend additional money at Maverick's properties, including money that they might otherwise spend at tribal casinos.

This Circuit recognizes "an ample competitor standing doctrine."  *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1109 (9th Cir. 2020).  The "inability to compete on an even playing field constitutes a concrete and particularized injury," and even a "slight competitive disadvantage … is sufficient."  *City of Los Angeles v. Barr*,

929 F.3d 1163, 1173–74 (9th Cir. 2019).   Further, "[a] plaintiff need not participate in the competition; the plaintiff need only demonstrate that it is 'able and ready … .'"  *Planned Parenthood of Greater Wash.*, 946 F.3d at 1108 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).   The "doctrine of 'competitor standing' is grounded in the 'basic law of economics that increased competition leads to actual injury.'"  *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)).

"Causation and redressability are generally implicit in injury-in-fact under the competitor standing doctrine."  *Planned Parenthood of Greater Wash.*, 946 F.3d at 1108.  This is because "the injury is the increase in competition," not just "the ultimate … loss of sales."  *Id.*  With the injury properly defined, "causation and redressability then derive from [b]asic economic logic": a "change of a competition's rules causes the injury and a court's invalidation of the change redresses the injury."  *Id.* at 1108–09 (internal quotation marks and alteration omitted); *see id.* at 1109 (noting that while a court cannot "decide the winner" of a competition, it "does have the power to decide that particular criteria are impermissible").

Maverick has standing under these well-settled rules to challenge Washington's tribal class III gaming monopoly.  That monopoly plainly imposes a competitive disadvantage on Maverick by giving Indian tribes a right to offer class III games that Maverick is criminally prohibited from offering, and a judicial decision invalidating this monopoly would redress Maverick's injury by guaranteeing it the right to compete with the Tribes on an even playing field.  *Accord W. Flagler Assocs. v. Haaland*, 2021 WL 5492996, at *4–6 (D.D.C. Nov. 22, 2021) (finding casino operator had standing to bring similar challenge to Secretary's approval of compact authorizing tribal sports-betting monopoly).

Because Maverick is shut out from the lucrative class III gaming market and because Washington's tribal gaming monopoly inflicts competitive harm on Maverick's existing cardrooms, Maverick filed this suit.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1

## **ARGUMENT**

2    I.    **The Constitution's Guarantee Of Equal Protection Forbids Granting Tribal Casinos
          A Monopoly Over Class III Gaming.**

3            Washington's tribal gaming monopoly, which allows tribal casinos—and tribal casinos

4    alone—to offer the full gamut of class III gaming in the state, constitutes discrimination that is

5    subject to strict scrutiny under the Constitution's guarantee of equal protection.  But the tribal

6    monopoly at issue here cannot survive even rational-basis review, let alone strict scrutiny.

7    Washington's restriction of class III gaming to state-approved groups therefore violates

8    Maverick's equal-protection rights, and Maverick is entitled to nominal damages and declaratory

9    and injunctive relief putting an end to this disparate treatment.  Maverick acknowledges that its

10   equal-protection argument is currently foreclosed in this Circuit by the Ninth Circuit's decision in

11   *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 731–42 (9th Cir. 2003), but it

12   respectfully preserves its argument for further review.

13            A.    **Limiting class III gaming to Indian tribes constitutes racial discrimination and
                  is therefore subject to strict scrutiny.**

14            "[A]ll racial classifications, imposed by whatever federal, state, or local governmental

15   actor, must be analyzed by a reviewing court under strict scrutiny."  *Adarand Constructors, Inc. v.*

16   *Peña*, 515 U.S. 200, 227 (1995).  Washington's maintenance of a tribal monopoly over class III

17   gaming is one such racial classification.

18            Classifications based on tribal status generally constitute classifications based on race.

19   Tribal membership is not available to just anyone; it hinges on lineal descent from historical tribal

20   rolls and, often, a minimum blood threshold.  *See, e.g.*, *Colville Tribes – Enrollment FAQ*,

21   Confederated Tribes of the Colville Reservation, *available at* https://tinyurl.com/mjwxaym6 ("In

22   order to be eligible for enrollment the applicant must possess at least one-fourth (1/4) degree of

23   the blood of the tribes which constitute the Colville Tribes.").  Indeed, under federal regulations,

24   one of the "criteria for acknowledgment as a federally recognized Indian tribe" is that the tribe's

25   "membership consists of individuals who descend from a historical Indian tribe."  25 C.F.R.

26   § 83.11(e).  When a law makes a classification based on tribal membership, it is often making a

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

racial classification subject to strict scrutiny because it uses ancestry as "a proxy for race." *Rice v. Cayetano*, 528 U.S. 495, 514, 520 (2000) (holding that a state law giving preferential voting rights "to a class of *tribal Indians*, to the exclusion of all *non-Indian* citizens," is an impermissible "racial classification") (emphases added). A classification based on tribal status contains baked-in classifications based on ancestry and blood—precisely the sort of classification subject to strict scrutiny.

This general rule—that classifications based on tribal status are generally racial in nature—is subject to a limited exception for laws that draw "political" classifications rather than racial ones. *Morton v. Mancari*, 417 U.S. 535, 552, 553 n.24 (1974); *see also Rice*, 528 U.S. at 520 (describing *Mancari*'s rule as a "limited exception" and declining to extend it). But this limited exception extends only to the regulation of tribes as political entities in matters pertaining to Indian self-government or internal tribal affairs. That limited exception does not save Washington's tribal monopoly for two reasons.

*First*, *Mancari*'s limited exception shields "only those statutes that affect uniquely Indian interests." *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997). "[T]he peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf *when rationally related to the Government's 'unique obligation toward the Indians.'*" *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979) (quoting *Mancari*, 417 U.S. at 555) (emphasis added). That limitation is evident in *Mancari* itself, which allowed a hiring preference for Indians in the Bureau of Indian Affairs. The special treatment in *Mancari* dealt with issues related to Indian land, tribal status, self-government, or culture. *See Mancari*, 417 U.S. at 555; *see also Williams*, 115 F.3d at 664–65 & n.6 (collecting cases and statutes). The *Mancari* Court expressly acknowledged that a federal hiring preference *outside* the Bureau of Indian Affairs—*i.e.*, in a context untethered to uniquely Indian interests—would present an "obviously more difficult question." 417 U.S. at 554; *see also Williams*, 115 F.3d at 664–65.

*Rice* confirmed *Mancari*'s limited scope. There, the Supreme Court confronted a Hawaii state law that allowed only "descendants of people inhabiting the Hawaiian Islands in [or before]

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1778" to vote in a "statewide election" for an agency that "administer[ed] programs designed for the benefit of" those descendants. *Rice*, 528 U.S. at 498–99. Hawaii sought to justify its voting scheme by arguing that it "fit[] the model of *Mancari*." *Id.* at 520. The Court assumed that it could "treat Hawaiians or native Hawaiians as [Indian] tribes," but it nevertheless rejected Hawaii's "far reaching" argument and invalidated Hawaii's restrictive voting scheme, holding that this ancestral classification functioned as a "proxy" for race because it sought "to preserve th[e] commonality of [these] people." *Id.* at 514–20. The Court declined to extend *Mancari*'s reach beyond the Bureau of Indian Affairs—"an agency described as '*sui generis*'"—and described *Mancari*'s "limited exception" as dependent on the Court's conclusion that "the BIA preference could be 'tied rationally to the fulfillment of Congress' unique obligation toward the Indians,' and was 'reasonable and rationally designed to further Indian self-government.'" *Id.* at 520 (quoting *Mancari*, 417 U.S. at 554–55). The Court rejected any reading of *Mancari* that would stretch its "limited exception" to "a new and larger dimension." *Id.* at 520. "To extend *Mancari* to this context would be to permit a State, by racial classification, to fence out whole classes of its citizens from decisionmaking in critical state affairs." *Id.* at 522.

In the same way, allowing Washington to "fence out whole classes" of entities from the casino-gaming industry would impermissibly extend *Mancari*'s "limited exception" to "a new and larger dimension." *Rice*, 528 U.S. at 520, 522. Unlike the Bureau of Indian Affairs' hiring practices at issue in *Mancari*, casino gaming is not a uniquely tribal interest. "[U]niquely" tribal interests include matters inherently related to Indian land, tribal status, self-government, or culture. *See Williams*, 115 F.3d at 664–65 & n.6 (collecting cases and statutes); *see also, e.g.*, *Mancari*, 417 U.S. at 554 (hiring preference in BIA was "directed to participation by the governed in the governing agency"). As the existence of countless non-tribal casinos (including Maverick's) and non-Indian casino patrons demonstrates, the gaming industry is not a "uniquely Indian interest." Casinos are no more "uniquely Indian" than the host of other businesses that happen to be tribally operated. Nor is there any indication of past discrimination against tribal casinos in the

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

Washington casino industry that might justify special treatment.  *Cf. Tafoya v. City of Albuquerque*, 751 F. Supp. 1527, 1531 (D.N.M. 1990).

In *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003), the Ninth Circuit, confronting a similar challenge to California's tribal monopoly over class III gaming, refused to apply strict scrutiny, but its reasoning was inconsistent with both Supreme Court and prior Ninth Circuit precedent.  Maverick recognizes that this Court is bound by *Artichoke Joe's* as a precedent of the Ninth Circuit.  But Maverick respectfully preserves for the Ninth Circuit's review its arguments that *Artichoke Joe's* is inconsistent with the Constitution, IGRA, and Supreme Court precedent.

In holding that California's tribal gaming monopoly was subject only to rational-basis review, *Artichoke Joe's* observed that IGRA's operative provisions "expressly relate only to *tribes*, not to individual Indians," and asserted that IGRA "relates to tribal status and tribal self-government" and "regulates activities only on Indian lands."  353 F.3d at 734–35.  But Supreme Court precedent has made clear that tribal classifications, too, can discriminate on the basis of race. In *Rice*, for example, the Court held that a tribal classification—even one designed to afford "a measure of self-governance"—can be an impermissible "racial classification."  528 U.S. at 520–22.  A classification based on an "ancestral inquiry mandated by the State implicates the same grave concerns as a classification specifying a particular race by name," *id.* at 517, and as detailed above, classifications based on tribal status bake in classifications based on ancestry and blood. Likewise, in *Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013), the Supreme Court considered a statute that imposed heightened standards to terminate parental rights for a child who is a member of an Indian tribe or who is the biological child of a member of an Indian tribe.  The Court explained that interpreting the statute to permit an absentee parent who was a member of an Indian tribe to defeat adoption proceedings "would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian," which "would raise equal protection concerns."  *Id.* at 655–56.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

Moreover, even if IGRA itself—which contemplates parity between tribal and non-tribal class III gaming—could be tied to "uniquely Indian interests," the exclusion of non-tribal casinos from class III gaming cannot. Indeed, the decision in *Artichoke Joe's* is in tension with prior Ninth Circuit precedent expressing "serious[] doubt that Congress could give Indians a complete monopoly on the casino industry." *Williams*, 115 F.3d at 665. The Ninth Circuit was correct in *Williams*. Its subsequent decision in *Artichoke Joe's* that a State may exclude persons from a highly lucrative sector of the economy based on their bloodlines without offending the Constitution's guarantee of equal protection should be reconsidered.

*Second*, even if *Mancari* could be read more broadly for *federal* statutes, it would not justify discriminatory *state* laws like Washington's tribal gaming monopoly. *Mancari* relied on special federal sources of authority—the Indian Commerce Clause, the treaty power, and the federal government's trust relationship with Indian tribes—that do not apply to exercises of state power. *See Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 501 (1979) (noting that states "do not enjoy this same unique relationship with Indians"). Because states lack the power and position of the federal government vis-à-vis Indian tribes, it is "quite doubtful that *Mancari*'s language can be extended to apply to preferential *state* classifications based on tribal status." *KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 19 (1st Cir. 2012).[4]

Washington's decision to allow tribal casinos—and only tribal casinos—to offer class III gaming within the state is therefore subject to strict scrutiny.

**B.     Washington's tribal monopoly cannot survive strict scrutiny.**

A law fails strict scrutiny unless it is "narrowly tailored" to "further compelling governmental interests." *Adarand*, 515 U.S. at 227. "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."

---

[4] The Supreme Court's decision in *Yakima* does not save Washington's tribal monopoly from strict scrutiny. *Yakima* relaxes the standard of review only where federal law explicitly authorizes a particular state law. *See Yakima*, 439 U.S. at 501; *Rice*, 528 U.S. at 518; *KG Urban Enters.*, 693 F.3d at 20–24. For the reasons explained *infra* in Part II, IGRA does not allow tribal monopolies over class III gaming.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)). Here, Washington's tribal monopoly cannot come close to clearing that exceptionally high bar.

To begin, there is no compelling interest in protecting tribal casinos from competition. Again, there is no indication of past discrimination against tribal casinos in the Washington gaming industry. *Cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504 (1989); *Tafoya*, 751 F. Supp. at 1531. Indeed, as Part II demonstrates, a tribal monopoly is affirmatively *contrary* to IGRA's policy of promoting free-market competition in the gaming industry.

Nor is a tribal monopoly a narrowly tailored means of furthering any interests a state may have in tribal economic development. First, the government receives "no deference" on narrow tailoring. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013). Moreover, granting a monopoly in any context will rarely, if ever, be a narrowly tailored solution. *See Croson*, 488 U.S. at 508 (finding it "obvious" that "an absolute preference over other citizens based solely on their race" was "not narrowly tailored to remedy the effects of prior discrimination"); *Tafoya*, 751 F. Supp. at 1531 (similar). Any generalized interest in promoting tribal economic development could be pursued through non-discriminatory subsidies, incentive programs, tax breaks, or other means substantially narrower than a state-conferred monopoly.

Indeed, if a monopoly over an entire industry were considered narrow tailoring and tribal economic development a compelling interest, then tribes could be awarded monopolies over entire sectors of the economy. That is not the law. And it follows that the casino-gaming industry—which brought in more than $2.9 billion to Washington's tribal casinos in 2019 alone—cannot, consistent with equal protection, be designated "tribal casinos only."

### C. Even if strict scrutiny did not apply, Washington's naked protectionism for a favored class lacks a rational basis.

Even under rational-basis review, Washington's tribal monopoly would fail constitutional muster. Numerous courts have recognized that bare economic protectionism for a favored class does not satisfy the constitutional need for a rational basis to justify legal classifications. *See, e.g.*,

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013); *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002). In this Circuit, "favor[ing] economically certain constituents at the expense of others similarly situated" is considered "irrational," and "economic protectionism for its own sake … cannot be said to be in furtherance of a legitimate governmental interest." *Merrifield v. Lockyer*, 547 F.3d 978, 991 & n.15 (9th Cir. 2008). Washington's tribal monopoly does nothing more than that.

Even in courts that have recognized some forms of economic protectionism as a sufficient rational basis, Washington's tribal monopoly would fail. The Tenth Circuit, for example, has stated that "intrastate economic protectionism constitutes a legitimate state interest," *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004), but even that generous reasoning does not stretch far enough to cover the situation here. The *Powers* court focused on "favoring one intrastate industry over another," *id.*; here, Washington's tribal monopoly does not favor the *gambling industry* but rather one discrete, racially defined class *within* the gambling industry.

The Ninth Circuit in *Artichoke Joe's* held that it is rational for a state to prohibit class III gambling as a vice activity associated with crime while simultaneously permitting "Indian tribes to choose a different path." 353 F.3d at 736–42. But that reasoning does not hold together. First, it is not rational to broadly ban class III gaming on the ground that it is a vice associated with criminality while at the same time giving Indian tribes *carte blanche* to offer a wide variety of those very class III games. Second, the "vice" rationale assumes that offering class III gaming is detrimental, but this assumption is at war with the case-dispositive conclusion in *Artichoke Joe's* that allowing class III gaming by tribal casinos *benefits* Indian tribes. *See infra* at 25. Third, any State interest in permitting tribal lands to become gaming hotspots exempt from the State's gaming laws is inconsistent with IGRA, which states that a tribe's regulation of gaming should be just as strict as that of the State in which it is located. *See* 25 U.S.C. § 2710(d)(5) ("Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, *except* to the extent that such regulation is inconsistent with, *or less*

*stringent than*, the State laws and regulations made applicable by any Tribal-State compact … ." (emphases added)).

Washington's tribal monopoly cannot survive under any standard of review.

## II.    IGRA Does Not Allow States To Create A Tribal Monopoly Over Class III Gaming.

Congress has squarely addressed the issue of class III gaming on Indian lands and the States' power to regulate it, and it has created a three-part test to determine whether such gaming is lawful:

Class III gaming activities shall be lawful on Indian lands *only* if such activities are—

> (A)    authorized by an ordinance or resolution that—
>
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
>
> (ii) meets the requirements of subsection (b), and
>
> (iii) is approved by the Chairman,
>
> (B)    *located in a State that permits such gaming for any purpose by any person, organization, or entity*, and
>
> (C)    conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1) (emphases added).   The second of these requirements—the "state-permission requirement"—establishes Congress's vision of parity between tribal and non-tribal gaming regulations.   A state need not allow class III gaming at all, but to allow it on Indian land, the State must "permit[] such gaming" for non-tribal entities as well.   That plain textual reading is confirmed by neighboring provisions in IGRA, Congress's purpose in passing IGRA, and the constitutional problems that would arise from a contrary reading.   Maverick acknowledges that its statutory argument concerning the proper interpretation of IGRA is foreclosed in this Circuit by the Ninth Circuit's decision in *Artichoke Joe's*, 353 F.3d at 720–31, but it respectfully preserves its argument for further review.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

### A.    IGRA's text imposes a state-permission requirement.

Under IGRA, class III gaming is unlawful on Indian land unless the state "permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). This means that the State must allow *non-tribal entities* to engage in class III gaming as a condition of *tribal* gaming, for several reasons.

*First*, a state lacks the power to "permit" class III gaming *only on Indian lands*. Under IGRA, class III gaming is unlawful by default. Only *federal* law can permit class III gaming on Indian lands, and it does so only when Section 2710(d)(1)'s three conditions are met. And Section 2710(d)(1)(B) lacks any language delegating authority to states to "permit" tribal gaming on tribal lands. *Cf. Yakima*, 439 U.S. at 501 (upholding state law only because the state "was legislating under explicit authority granted by Congress"). A state simply has no power, outside its role in Section 2710(d)(1)'s compacting process, to regulate class III gaming on Indian land. *See Taxpayers of Mich. Against Casinos v. State*, 685 N.W.2d 221, 227 (Mich. 2004). Indeed, the Supreme Court in *Cabazon* made clear that, while a State could ban gaming within its borders altogether, States do not have any other jurisdiction over gaming on tribal lands. 480 U.S. at 209. And because states lack authority to "permit" class III tribal gaming, the state-permission requirement must refer to permission for *non-tribal* gaming.

*Second*, a tribal-state compact cannot satisfy *both* Section 2710(d)(1)(B)'s state-permission requirement *and* Section 2710(d)(1)(C)'s compact requirement. Section 2710(d)(1)(C) conditions the lawfulness of tribal gaming on a valid compact. Section 2710(d)(1)(B)'s state-permission requirement, then, must require something different, as the canon against superfluity counsels against reading the state-permission requirement and the compact requirement to require the same thing. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (rejecting statutory interpretation that was "completely circular"). Allowing a compact to satisfy not only the compact requirement but also the state-permission requirement would result in "patent bootstrapping." *Citizen Band of Potawatomi Indian Tribe of Okla. v. Green*, 995 F.2d 179, 181 (10th Cir. 1993).

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Third*, the phrase "any person, organization, or entity" does not include Indian tribes.  As a matter of plain English, it would be awkward for "any person, organization, or entity" to refer to the very tribes whose authority is under question, whose authority the state has no power to regulate, and whose authority is dealt with in a separate provision (Section 2710(d)(1)(C), the compacting provision).

Moreover, Congress knows how to include Indian tribes when it wants to, and it failed to do so here.  Other laws define the term "person" to expressly include Indian tribes.  *See, e.g.*, 33 U.S.C. § 1362(4)–(5); 42 U.S.C. § 6903(13), (15); *id.* § 300f(10), (12); *see also Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701 (2003) (a tribe is not a "person" who may sue under § 1983); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132–33 (2004) ("any entity" does not include state political subdivisions).  IGRA's definitional section, unlike other statutes, does not define "person" (or "organization," or "entity") to include Indian tribes.  *See* 25 U.S.C. § 2703.

Thus, the only way for a state to "permit" class III gaming—and satisfy Section 2710(d)(1)(B)'s state-permission requirement—is to allow class III gaming by non-tribal entities.  Because Washington has not done so, class III gaming remains unlawful on Indian lands.

### B. Neighboring provisions confirm that class III tribal gaming is allowed only if it is permitted for non-tribal entities.

Section 2710(d)(1)(B)'s state-permission requirement is reinforced throughout IGRA's statutory scheme, which is full of language that requires or assumes parity between a state's general regulatory framework over gaming and the regulations applicable to tribal gaming on Indian lands.

IGRA gives Indian tribes the power to "license and regulate" class II gaming on Indian lands that are "within a State that permits such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(b)(1)(A).  It would make no sense to give *Indian tribes* this regulatory power if *the state* had already "permit[ted]" tribes to engage in class II gaming.  Moreover, States have no role whatsoever in regulating class II gaming on Indian land (not even a compacting role), so the "permits such gaming" language of Section 2710(b)(1)(A) must refer to non-tribal gaming.

22

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

And Section 2710(d)(1)(B)'s identical language should be read in the same way.  *See Robers v. United States*, 572 U.S. 639, 643 (2014).

Additionally, 18 U.S.C. § 1166(a)—which was enacted alongside IGRA—provides that state gaming laws apply to non-IGRA-compliant gaming "in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."  In line with the rest of the Act, that provision maintains parity of regulation between tribal and non-tribal gaming.  Similarly, IGRA itself waives application of the Johnson Act—which prohibits "any gambling device … within Indian country," 15 U.S.C. § 1175(a)—only if class III gaming is "conducted under a Tribal-State compact that—(A) is entered into under paragraph (3) *by a State in which gambling devices are legal*, and (B) is in effect."  25 U.S.C. § 2710(d)(6) (emphasis added).  These criminal laws make clear that IGRA exists in a broader context that insists on parity between tribal and non-tribal gambling.

Other provisions of IGRA further confirm this reading.  When an Indian tribe wants to conduct class III gaming on Indian land and asks the state to negotiate a tribal-state compact, IGRA requires the state to "negotiate with the Indian tribe in good faith to enter into such a compact."  25 U.S.C. § 2710(d)(3)(A).  But if a state *prohibits* class III gaming for non-tribal entities, the negotiation requirement does not apply.  *See Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1258 (9th Cir. 1994); *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 279 (8th Cir. 1993).  That is because "a state need only allow Indian tribes to operate games that others can operate."  *Rumsey*, 64 F.3d at 1258.  IGRA simply has no application when the State generally forbids non-tribal entities from offering class III games.

Finally, Congress's textually expressed findings in IGRA drive the point home.  Congress found that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands" if the gaming is "conducted within a State which does not, as a matter of criminal and public policy, prohibit such gaming activity."  25 U.S.C. § 2701(5).  If a state *does* "prohibit such gaming activity," however, then Indian tribes have no such right.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1

2

### C.     Congress's purpose in passing IGRA was to create parity between tribal and non-tribal gaming.

All of this textual and contextual evidence is consistent with Congress's purpose in passing IGRA.  Congress passed IGRA in response to *Cabazon*, 480 U.S. 202, which had denied States the power to apply generally applicable gaming regulations to tribal gaming and had thereby created a divergence between tribal and non-tribal gaming within a single state.  "IGRA was designed to avoid precisely that kind of patchwork prohibition, in which the state banishes gaming in one county or situation and allows it in another."  *Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1084 (7th Cir. 2015).  Hoping to foster "free market competition" between state-licensed gaming operators and Indian tribes, Congress sought to promote "a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied."  S. Rep. No. 100-446, at 6, 13 (1988); *see also Keweenaw*, 136 F.3d at 473.

IGRA was meant to extend existing state regulatory backdrops onto Indian lands—effectively reversing *Cabazon*.  *See* S. Rep. No. 100-446, at 6.  Numerous excerpts from IGRA's Senate Report reveal Congress's assumption that Indian gaming would be conducted in line with States' otherwise-applicable gaming regulations.  *See id.* at 2, 12–15.  That report specifically decried the "uncertainty" of a pre-IGRA system in which "some tribes may engage in forms of commercial gaming that have been banned completely by the State in which that tribe has its reservation."  *Id.* at 23.  IGRA was designed to "ensure that the Indians are given a level playing field in order to install gaming operations that are the same as the States in which they reside." 134 Cong. Rec. 24,027 (1988) (statement of Senator McCain).  And as the provisions discussed above make clear, Congress drafted IGRA to ensure that a level playing field existed.  If Washington wishes to grant Indian tribes the right to offer class III gaming to the public, it must grant the same right to non-tribal entities as well.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

### D.     Even if IGRA were ambiguous, the canon of constitutional avoidance requires reading it to avoid the serious constitutional questions that a tribal monopoly raises.

Under the canon of constitutional avoidance, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also Rust v. Sullivan*, 500 U.S. 173, 191 (1991).   Because of the serious equal-protection problems that a tribal monopoly would raise, Section 2710(d)(1)(B)'s state-permission requirement must be interpreted to require permission for non-tribal entities.  *Cf. Williams*, 115 F.3d 657 (rejecting Indian monopoly over reindeer herding in order to avoid constitutional questions).

The Ninth Circuit's contrary conclusion in *Artichoke Joe's* rests on an infirm foundation. After weighing each side's textual and contextual arguments, the court concluded that IGRA's text, context, purpose, and legislative history were "in equipoise."  353 F.3d at 725.  The court broke the tie in the State's favor only by resorting to "[t]he *Blackfeet* presumption"—a canon of construction that favors resolving ambiguities in favor of Indian tribes.  *Id.* at 728–29 (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985)).  The court thus adopted the State's interpretation "not because it is necessarily the better reading, but because it favors Indian tribes and the statute at issue is both ambiguous and intended to benefit those tribes."  *Id.* at 730.

That reasoning is flawed for several reasons.  *First*, the text, context, purpose, and legislative history of IGRA are not "in equipoise," so there is no occasion to invoke the *Blackfeet* presumption at all.  *Second*, if there were any ambiguity to resolve, the constitutional avoidance canon takes priority over the *Blackfeet* presumption.  *See Williams*, 115 F.3d at 663 & n.5; *cf. Chickasaw Nation v. United States*, 534 U.S. 84, 95 (2001) (disclaiming proposition that "the pro-Indian canon is inevitably stronger" than the anti-tax-exemption canon).  *Third*, the *Blackfeet* presumption does not apply here in any event, as it is not clear that allowing increased class III gaming on Indian lands—but not the rest of the state—would actually "favor" Indians.  *Cf.*

25

*Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n*, 14 F.3d 633, 637 (D.C. Cir. 1994) (questioning whether a more lax regulatory approach over gaming would favor Indians in light of IGRA's objective of "protecting tribes and their members from the dangers associated with large-scale gaming operations").

### III.    IGRA's State-Negotiation Mandate Violates The Anti-Commandeering Principle.

In addition to the equal-protection and statutory problems described above, the Secretary was required to disapprove the Compact Amendments because the process by which they were executed violated the Tenth Amendment's anti-commandeering principle.  The Ninth Circuit has not yet confronted this argument.

"The anticommandeering doctrine … is simply the expression of a fundamental structural decision incorporated into the Constitution," and "confirm[ed]" by the Tenth Amendment, to "withhold from Congress the power to issue orders directly to the States."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475–76 (2018).  Congress may not "command the States[] … to administer or enforce a federal regulatory program."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  This constitutional principle serves three "important" purposes:  "First, the rule serves as 'one of the Constitution's structural protections of liberty.'"  *Murphy*, 138 S. Ct. at 1477.  "Second, the anticommandeering rule promotes political accountability."  *Id.*  "Third, the anticommandeering principle prevents Congress from shifting the costs of regulation to the States."  *Id.*

Thus, the anti-commandeering doctrine holds that, while "[t]he legislative powers granted to Congress are sizable, … they are not unlimited," and "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."  *Murphy*, 138 S. Ct. at 1476.  IGRA, however, does exactly that.  Its state-negotiation mandate issues a "direct order" to state governments:  Upon receiving a request from an Indian tribe to negotiate a class III gaming compact, "the State *shall* negotiate with the Indian tribe in good faith to enter into such a compact."  25 U.S.C. § 2710(d)(3)(A) (emphasis added).  This negotiation requirement is mandatory, and "the United States may sue" a State to enforce the requirement.

26

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1235 (10th Cir. 2017). Indeed, the Ninth Circuit has described the States' role under IGRA as an "obligation." *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1030 (9th Cir. 2010) ("In IGRA, Congress … imposed on the states the obligation to work with tribes to reach an agreement under the terms of IGRA permitting [tribes] to engage in lawful class III gaming activities.").

That sort of "direct order[]" violates the Constitution's anti-commandeering principle and renders the process for entering into the Compact Amendments unlawful. *See Murphy*, 138 S. Ct. at 1476. Indeed, IGRA's offense against state authority exceeds that of laws previously invalidated by the Supreme Court. The provision struck down in *Printz*, for example, imposed duties on state officers only as an "interim" measure until a federal system became operative. *Printz*, 521 U.S. at 902–03. By contrast, IGRA imposes on States an ongoing duty to negotiate with Tribes, with no end date in sight.

When the Supreme Court analyzed IGRA in *Seminole Tribe of Florida v. Florida*, it expressly declined to decide the anti-commandeering issue. 517 U.S. 44, 61 n.10 (1996). At oral argument, however, several of the Justices noted the commandeering difficulties that the statute raised. *See* Transcript of Oral Argument at *14–15, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1995) (No. 94-12), 1995 WL 606007 (Justice Kennedy noting: "I simply know of no precedent for" "allow[ing] the national Government to order the States to invoke their political processes in behalf of a national goal."); *id.* at *28 (Justice Scalia articulating Florida's argument as objecting to being forced to act "as a flunky of the Federal Government"). They were correct. Congress lacks the power to order States to "negotiate in good faith" with Indian tribes in order to carry out the federal IGRA scheme.

Because the process through which the Compact Amendments were entered into—namely, IGRA's mandatory State-tribe negotiation requirement—violated the Constitution's anti-commandeering principle, they were not validly completed, they are unconstitutional, and the Secretary was required to disapprove them. 25 U.S.C. § 2710(d)(8)(B)(ii); *see also Amador Cnty. v. Salazar*, 640 F.3d 373, 381 (D.C. Cir. 2011). By approving the Compact Amendments and

purporting to authorize a violation of the Tenth Amendment, the Secretary violated IGRA.  The Secretary's approvals of the compact amendments therefore must be vacated so that Washington and the Tribes could have an opportunity to *voluntarily* negotiate compact amendments untainted by IGRA's unconstitutional command.

Additionally, the Compact Amendments must fall for the independent reason that IGRA's state-negotiation mandate is not severable from the remainder of the Act, so all of IGRA must be invalidated.  To be sure, IGRA has a severability clause stating that, if any of its provisions are invalidated, the remaining provisions shall remain in effect.  25 U.S.C. § 2721.  But a statute's inclusion of a severability clause creates only a rebuttable "presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).  This presumption is overcome by a showing that "Congress intended the entire relevant portion of the statute to depend upon the unconstitutional provision." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 862 (9th Cir. 2017).  In particular, courts must consider "whether the law [would] remain[] fully operative without the invalid provisions." *Murphy*, 138 S. Ct. at 1482 (internal quotation marks omitted).  Regardless of whether a statute includes a severability clause, the bottom-line rule is that an unconstitutional provision is not severable when "the statute created in its absence is legislation that Congress would not have enacted." *Alaska Airlines*, 480 U.S. at 685.

The compacting process is IGRA's centerpiece, and the state-negotiation mandate is what ensures that process takes place.  If IGRA did not "require[] the state to negotiate with the Tribe," then "'[t]he compact process that Congress established as the centerpiece of the IGRA's regulation of Class III gaming would thus become a dead letter.'"  *N. Arapaho Tribe v. Wyoming*, 389 F.3d 1308, 1312 (10th Cir. 2004) (quoting *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1031 (2d Cir. 1990)).  Congress never would have enacted IGRA without this central requirement.  Indeed, when the Tenth Circuit confronted the related question whether the provision that allowed tribes to sue States (which the Supreme Court struck down in *Seminole Tribe*) was severable from the rest of IGRA, that court held that the severance question was "a close one."  *New Mexico v.*

28

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

Brennan Legal, PLLC
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

*Dep't of Interior*, 854 F.3d at 1235.  That court ultimately concluded that the provision was severable from the rest of IGRA for the sole reason that IGRA's good-faith-negotiation requirement could still be enforced in several ways, including if a State waives or chooses not to raise its sovereign immunity, or if the United States brings suit to enforce the requirement.  *Id.* at 1234–35.  But if the good-faith-negotiation requirement as a whole were struck down, it would be impossible for IGRA to function "as intended." *Id.* at 1234.  All of IGRA therefore must fall along with the state-negotiation requirement.  And because that mandate is not severable from the remainder of the Act, none of IGRA's provisions can stand, and the Secretary lacked any authority to approve the Compact Amendments.

## CONCLUSION

For the reasons set forth above, Maverick respectfully requests that the Court grant its motion for summary judgment and award the relief requested in the complaint.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

**Brennan Legal, PLLC**
P.O. Box 1384
144 Railroad Ave. S., Ste. 308
Edmonds, WA  98020
(425) 967-3550

1      DATED August 12, 2022.

2                                    **BRENNAN LEGAL, PLLC**

3

4                                    By: *s/ Thomas M. Brennan*

5                                    Thomas M. Brennan, WSBA No. 30662
                                     P.O. Box 1384
6                                    144 Railroad Ave. S., Suite 308
                                     Edmonds, WA  98020
7                                    Phone: (425) 967-3550
                                     Email: tom@brennanlegalpllc.com
8

9                                    **GIBSON, DUNN & CRUTCHER LLP**

10                                   By: *s/ Theodore B. Olson*
                                     By: *s/ Matthew D. McGill*
11                                   By: *s/ Lochlan F. Shelfer*

12                                   Theodore B. Olson, D.C. Bar No. 367456
                                     Matthew D. McGill, D.C. Bar No. 481430
13                                   Lochlan F. Shelfer, D.C. Bar No. 1029799
                                     1050 Connecticut Avenue, N.W., Suite 900
14                                   Washington, D.C.  20036-5303
                                     Phone: (202) 955-8668
15                                   Email: tolson@gibsondunn.com
                                     Email: mmcgill@gibsondunn.com
16                                   Email: lshelfer@gibsondunn.com

17                                   *Attorneys for Plaintiff Maverick Gaming LLC*

18

19

20

21

22

23

24

25

26

30

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on this date I caused the foregoing document to be electronically

3   filed with the Clerk of the Court using the CM/ECF system which sends notification of the filing

4   to all counsel of record.

5          DATED August 12, 2022.

6                                        _/s/ Thomas M. Brennan_____
                                         Thomas M. Brennan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

31

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
(3:22-cv-05325 DGE)