EXHIBIT "3(C)"

WILLIAM BACON (ISB No. 2766)
Office of the Reservation Attorney
Shoshone & Bannock Tribes
Chief of Civil Litigation
Fort Hall Idaho 83203
Telephone: (208) 478-3815
Fax: (208) 239-9276

SCOTT CROWELL (WSB No.18868/ ASB No. 9654)
*Pro hac vice application pending*
Crowell Law Offices/Tribal Advocacy Group
10 N. Post, Suite 445
Spokane, Washington 99201
Telephone: (425) 828-9070
Fax: (425) 828-8978

Attorneys for Proposed Amici Shoshone Bannock Tribes

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WENDY KNOX and RICHARD DOTSON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, KENNETH LEE SALAZAR, Secretary of the Interior, <br><br> Defendants. | Case No. 4:09-CV-00162-BLW <br><br> AMICUS BRIEF OF THE SHOSHONE BANNOCK TRIBES SUPPORTING RECONSIDERATION OF THE COURT'S ORDER OF DECEMBER 27, 2010 |

# TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………………………..1

II.   ARGUMENT………………………………………………………………...1

      A.   The Court Should Reconsider its Rule 19 Decision because the Tribes' Interests
           are not Similarly Aligned……………………………………………….2

      B.   An Actual, Historic, and Inconsistently Applied Conflict Exists between the
           United States' Trust Responsibility to the Tribes and the United States'
           Obligations to take Enforcement Against Non-Compacted Class III Gaming……9

      C.   The Conflicts that Render the United States Incapable of Adequately
           Representing the Tribes is also Manifested in the Arguments it may
           not Make on the Merits of Plaintiffs' Claims Regarding the Constitutionality of
           Proposition One……………………………………………………………14

      D.   All Claims Should be Dismissed as Time-Barred………………………17

      E.   All Claims are now Moot, because Plaintiffs are Permanently Excluded from SBT
           Gaming Facilities……………………………………………………...19

III.  CONCLUSION……………………………………………………………..19

# TABLE OF AUTHORITES

**CASES**

*Adam v. Norton,*
 --F.3d--, 2011, n2, WL 692087, (9th Cir 2011)……………………………………………….2

*American Greyhound Racing v. Hull,*
 305 F.3d 1015, 1019 (9th Cir. 2002)……………………………………………………….2

*Artichoke Joe's Cal. Grand Casino v. Norton,*
 353 F.3d 712 (9th Cir. 2003)………………………………………………………………..8

*Chehalis Tribes v. Lujan,*
 928 F.2d 1496 (9th Cir. 1991)……………………………………………………………3, 9

*Cherokee Tribe v. Babbitt,*
 117 F.3d 1489, 1497 (D.C. Cir. 1997). ……………………………………………………4, 13

*Citizen Potawatomi v. Norton,*
 (10th Cir. 2001)………………………………………………………………………....3

*Clinton v. Babbitt* 180 F.3d 1081
 (9th Cir. 1999)……………………………………………………………………………..3

*Coeur d'Alene v. Idaho,*
 842 F.Supp. 1268 (D. Idaho 1994), *affirmed,* 51 F.3d 876 (9th Cir. 1995)……………..4, 7

*Dalton v. Pataki,*
 5 N.Y.3d 243, 835 N.E.2d 1180 (N.Y. 2005)………………………………………………8

*Enterprise Mgt. Consultants, Inc. v. United States,*
 883 F.2d 890, 893 (10th Cir. 1989)………………………………………………………..3

*Kescoli v Babbitt,*
 101 F.3d 1304 (9th Cir. 1996)……………………………………………………………..2

*League of Women Voters of California v. McPherson,*
 145 Cap.App.4th 1469, 1481, 52 Cal.Rptr.3d 585, 594 (Cal. App. 2006)………………16

*Makah Indian Tribe v. Verity,*
 910 F.2d 555 (9th Cir. 1990)…………………………………………………………….3, 9

*Manygoats v. Kleppe,*
 558 F.2d 556, 558 (10th Cir.1977)……………………………………………………….3, 4

*McClendon v. United States,*
    885 F.2d 627, 633 (9th Cir. 1989)……………………………………………………….2

*North Beach Amusement Co. v. U.S.,*
    240 F.2d 729 (4th Cir. 1957)……………………………………………………………...16

*Pub. Utils. Comm'n of the State of Cal. V. Fed. Energy Regulatory Comm'n,*
    100 F.3d 1451 (9th Cir 1996)………………………………………………………………2

*Quileute Indian Tribe v. Babbitt,*
    18 F.3d 1456, 1459-60 (9th Cir. 1994)………………….......................................3

*Schecter v. Killingsworth,*
    380 P.2d 136, 142 (Ariz. 1963)……………………………….................................16

*Seminole Tribe v. Florida*
    11 F.3d 1016 (11th Cir. 1994)……………………………………………………………5

*Seminole Tribe v. Florida,*
    517 U.S. 44, 48 (1996)……………………………………………………………………5

*Seneca-Cayuga Tribe of Oklahoma v. National Indian Gaming Com'n,*
    327 F.3d 1019, 1032 (10th Cir. 2003)………………… …………………………......16

*Spokane Tribe v. Washington*
    28 F.3d 991 (9th Cir. 1994)………………………………………………….5, 6, 9, 10

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007)……………………………………………………………10

*U.S. v. 103 Electronic Gambling Machines,*
    (9th Cir. 2000)……………………………………………………………………………16

*U.S. v. Twelve Miami Digger Slot Machines,*
    213 F.2d 918 (5th Cir. 1954)……………………………………………………………16

*U.S. v. One Hundred Thirty-Severn (137) Draw Poker-Type Machines,*
    606 F. Supp. 747 (D.C. Ohio, 1984)……………………… …………………………16

*U.S. v. Santee Sioux Tribe of Nebraska,*
    135 F.3d 558 (8th Cir. 1998)……………………………………………………………16

*Wichita and Affiliated Tribes,*
    788 F.2d 765, 777 (D.C. Cir. 1986)…………………………………………………….3

**STATUTES**

25 U.S.C. 2501......................................................................................................6

Idaho Code 67-429(B).............................................................................................7

Idaho Code 67-429(B)(2)..........................................................................................7

**RULES**

Fed. R. Civ. P. 19.............................................................................................passim

## I.    INTRODUCTION

The Shoshone-Bannock Tribes of the Fort Hall Reservation of Idaho ("SBT") is a federally recognized Indian tribe possessing sovereign authority over its members, its territories and activities thereon pursuant to the laws of the United States.  The alleged activities giving rise to the instant litigation occurred on SBT's federally recognized Reservation and within its Class III gaming facility.  As a result, a correct understanding of Shoshone Bannock's unique history of Class III gaming upon its Reservation is central to the proper adjudication of this case.

Moreover, Plaintiffs seek relief that could jeopardize SBT's ongoing Class III gaming operations, which produce a substantial portion of governmental revenue necessary for the Tribe to provide essential governmental services to its members. *See* Small Decl., Exh. 1, ¶ 12, Motion of Shoshone Bannock Tribes to Participate as *Amicus*. ("Small Decl."). Given the magnitude of these uniquely Tribal interests, SBT has moved for amicus status concurrently with the submission of this proposed Amicus Brief.

## II.    ARGUMENT

There are three principle reasons why the United States cannot adequately represent the interests of Idaho tribes in this case: 1) the substantial differences between the Shoshone Bannock Compact and those of the Northern Idaho preclude the United States from adequately representing all tribes in this case; 2) the conflicting and inconsistent positions of the United States regarding enforcement action against non-compacted Class III gaming renders the United States incapable of adequately representing the all tribes; and, 3) the United States' inability to raise substantive arguments absent tribes undoubtedly would make in this litigation. The Court therefore should revisit its Rule 19 analysis.  Additionally, all claims are time-barred because

Plaintiffs were able to play TVGDs at gaming facilities on the Fort Hall Reservation since the early 1990s, well before the Secretary's approval of the Compact Amendments for the Northern Idaho Tribes. Finally, this case is moot given the Tribe's permanent exclusion of Plaintiffs from Fort Hall gaming facilities.

**A.    The Court Should Reconsider its Rule 19 Decision because the Tribes' Interests are not Similarly Aligned.**

In seeking reconsideration, The United States correctly argues that matters of standing and mootness run to this Court's Article III jurisdiction. *See* Mem. In Supp. of Mot. to Reconsider and Mot. For Sum. Jud. (Doc 51-1) at 6. Similarly, if SBT is a necessary and indispensable party to this litigation, the Tribe's sovereign immunity precludes joinder. As the Ninth Circuit recently declared, sovereign immunity runs to the core of this Court's subject matter jurisdiction and thus can be raised at any time prior to final judgment. *Adam v. Norton*, --F.3d--, 2011, n2, WL 692087 (9th Cir 2011). As such, this Court is under a continuing obligation to assess whether SBT's sovereign immunity deprives this Court of subject matter jurisdiction, which obligation may be exercised *sua sponte*. *Pub. Utils. Comm'n of the State of Cal. V. Fed. Energy Regulatory Comm'n,* 100 F.3d 1451 (9th Cir 1996).

In circumstances such as those presented here, when the absent Tribes are signatory parties to the agreement that may be struck down as a result of the litigation, the Ninth Circuit has demonstrated great reluctance to allow litigation to proceed without the absent tribes. *American Greyhound Racing v. Hull*, 305 F.3d 1015, 1019 (9th Cir. 2002) (absent tribes to action challenging tribal state gaming compacts not adequately represented by the State defendants); *Kescoli v Babbitt,* 101 F.3d 1304 (9th Cir. 1996) (Rule 19 dismissal is appropriate if the action impacts the absent tribes' ability to obtain the bargained-for benefits of the contract); *McClendon v. United States*, 885 F.2d 627, 633 (9th Cir. 1989) (Indian tribe is necessary party to action

seeking to enforce lease agreement signed by tribe); see also *Enterprise Mgt. Consultants, Inc. v. United States*, 883 F.2d 890, 893 (10th Cir. 1989) (Indian tribe is necessary party to action seeking to validate contract with tribe).

In disputes involving intertribal conflicts, the United States cannot properly represent any of the tribes without compromising its trust obligations owed to all tribes. See, *Makah Indian Tribe v. Verity*, 910 F.2d 555 (9th Cir. 1990) (absent tribes holding treaty right to salmon are necessary parties to Makah's challenge to Department of Interior's inter-tribal fish allocation decision)*; Clinton v. Babbitt* 180 F.3d 1081 (9th Cir. 1999) (Displaced Navajos seeking to stay on Hopi lands – dismissed because Hopi not party to lawsuit, but is party to subject lease agreements)*; Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1459-60 (9th Cir. 1994) (governing tribe of reservation is necessary and indispensable party to suit challenging agency decision that fractional interests in trust property escheated to governing tribe under federal statute); *Chehalis Tribes v. Lujan,* 928 F.2d 1496 (9th Cir. 1991) (Quinault Indian Nation is necessary and indispensable party to suit challenging the United States' continuing recognition of Quinault Indian Nation as the sole governing authority for the Quinault Indian Reservation). See also, *Citizen Potawatomi v. Norton*, (10th Cir. 2001) (absent tribes were part of shared funding mechanism); *Wichita and Affiliated Tribes,* 788 F.2d 765, 777 (D.C. Cir. 1986): *Manygoats v. Kleppe*, 558 F.2d 556, 558 (10th Cir.1977)(United States incapable of representing the interest of the absent party Navajo Nation when it has conflicting obligations between NEPA and its trust responsibility to the Tribe).

A conflict amongst tribes exists if an adverse judgment would subject the Defendant to substantial risk of incurring double, multiple, or otherwise inconsistent obligations. *Makah,* 910 F.2d at 560*; Clinton*, 180 F.3d at 1088. A conflict between the United States and the Tribe exists

if the United States' obligations to the Tribe is compromised by other obligations, see *Manygoats*, 558 F.2d at 558, or if the United States has a record of inconsistent and changing positions regarding the implementation of those obligations, see *Cherokee Tribe v. Babbitt* 117 F.3d 1489, 1497 (D.C. Cir. 1997). As this Court noted in its Order, the United States cannot adequately represent the interest of the tribes when there are material arguments the absent "Tribes could make to defend the Secretary's approvals that the Secretary himself would not make, or not make as well." Order at pp. 23-24 (citing *Daley*, 173 F.3d at 1167).

In its Order, this Court concluded that the positions among the Idaho Tribes are aligned. However, SBT's position on machine gaming has always differed from the Northern Tribes and those differences are reflected in SBT's Compact. From the adoption in 1992 of the Idaho Constitutional Amendment regarding gaming, SBT has maintained that IGRA requires Idaho to negotiate a compact for a variety of machine games to be in play, consistent with Idaho's express authorization of Lottery games and short of violating the Constitutional prohibition of slot machines. See Art. III, Sec. 20 Idaho Constitution. While Idaho executed compacts with the three Northern Tribes in 1993, the Shoshone-Bannock Tribes refused to agree to those same terms because the State's proposed compact did not adequately address the machine gaming issue. *See* Small Decl., ¶ 12. Shoshone Bannock's concerns were soon proven to be correct when the Coeur d'Alene Tribe litigated with the State over whether the initial compact allowed for machine games, and lost. *Coeur d'Alene v. Idaho*, 842 F.Supp. 1268 (D. Idaho 1994), *affirmed,* 51 F.3d 876 (9th Cir. 1995).

Unable to secure a compact that expressly allowed for the operation of machine games, Shoshone Bannock on March 5, 1993, pursued its remedies under IGRA by filing a lawsuit

against Idaho for bad faith negotiations. *Shoshone Bannock Tribes v. Idaho,* No. CV 93- 0067-E-BLW, Memorandum Decision and Order, (D. Idaho filed Feb. 13, 1997). ("*Shoshone Bannock I*").[1] The State asserted 11th Amendment immunity as an affirmative defense. At that time, the legal question of whether a state's 11th Amendment immunity barred lawsuits brought by tribes under IGRA was working its way through the appellate courts, see e.g. *Spokane Tribe v. Washington* 28 F.3d 991 (9th Cir. 1994), *Seminole Tribe v. Florida* 11 F.3d 1016 (11th Cir. 1994), causing Shoshone Bannock's lawsuit to be stayed[2] for a number of years. Ultimately, on February 13, 1997 this Court dismissed that lawsuit in the wake of the Supreme Court decision in *Seminole Tribe v. Florida,* 517 U.S. 44, 48 (1996).

Throughout this time period, SBT began operating a large variety of machine games, including "Video Pull Tab Machines" which later would be referred to as Tribal Video Gaming Devices ("TVGD"). (Doc. 51-5, ¶ 10). The three Northern Tribes also operated a large variety of machine games since the early 1990s, despite the court ruling in *Coeur d'Alene v. Idaho. See* Small Decl., Attachment C at 10-11. However, there was a critical difference between the legal positions of SBT and the Northern Idaho Tribes: the SBT defended its non-compacted gaming operation on the legal premise that IGRA entitles it to a compact that provides for wide range of machine games, and since the Shoshone Bannock Tribes had done everything IGRA requires it to do to obtain a gaming compact, federal enforcement is inappropriate – see *Spokane v United*

---

[1] With the exception of the Ninth Circuit's publication of *SBT III,* 465 F.3d 1095, 1097 (9th Cir. 2006), the several Court decisions regarding gaming on SBT's Indian lands are not published and were issued prior to 2007 such that citation to those decisions may violate Fed.R.App.P 32.1. However, the Court's Order expressly references those decisions. Accordingly, SBT Tribes references those decisions in this Amicus Brief.

[2] Technically, rather than staying the case, the Court administratively terminated the case and reopened the case twice: first pending the Ninth Circuit's consideration of the 11th Amendment issues in *Spokane Tribe v. Washington*, and second pending the Supreme Court's consideration of 11th Amendment issues in *Seminole Tribe v. Florida.*

*States,* 139 F.3d 1297 (9th Cir. 1998). In sharp contrast, the three Northern Tribes operated machine games allegedly in breach of their gaming compacts, their contracts, with the State of Idaho.

After *Shoshone-Bannock I* (the IGRA bad faith lawsuit against State), a threatened raid by U.S. Marshalls, *Shoshone-Bannock II* (the injunction action against the United States with a full evidentiary hearing in front of US Magistrate Williams), and the Governor's Gaming Study Committee, SBT and Idaho finally reached a Compact in 2000 that included a process for resolving the longstanding dispute over the Tribe's entitlement under IGRA to a large range of machine games. The SBT Compact provides for the full scope of permissible games that the State is required to negotiate under The Indian Gaming Regulatory Act 25 U.S.C. 2501 *et seq.* ("IGRA"):

> . . . the Tribes may operate in its gaming facilities located on Indian lands, any gaming activity that the State of Idaho "permits for any person, organization or entity" as the phrase is interpreted in the context of the Indian Gaming Regulatory Act.

SBT Compact at § 4(a). *See* Small Decl. Attachment B. The Compact sets forth in detail the differing views of the two governments regarding machine gaming and provides that the question as to what machine games are "permitted" gaming, as that term is used in IGRA, will be submitted to the federal courts for resolution. By operation of the Compact's terms, SBT agrees to shut down and/or alter existing gaming devices upon a final court determination as to what gaming devices are "permitted" as that term is used in IGRA. With the parameters of the litigation set by the Compact, lawsuits were filed and consolidated - *Shoshone Bannock Tribes v. Idaho* CV-01-00052-BLW and *Idaho v. Shoshone Bannock Tribe,* CV-01-00171-BLW (collectively referred to as *Shoshone Bannock III)* – and the two governments were ready to proceed under the Compact terms, resulting in a definitive ruling of the lawful scope of

"permitted" gaming on Indian lands in Idaho. However, the Proposition One campaign hijacked the debate over the scope of gaming on Indian lands, and the lawsuit was stayed from proceeding on the merits.

Proposition One passed by a substantial margin.[3] After two unsuccessful challenges brought against Proposition One in Idaho State Courts, the Northern Tribes and the State of Idaho executed Amendments pursuant to the express terms of Proposition One, which were approved by the Secretary in 2003[4]. In sharp contrast to the SBT Compact, the Amended Compacts for the three Northern Tribes expressly authorize the singular machine game of a "Tribal Video Gaming Device", or "TVGD", as defined in the Compacts and Idaho statutes resulting from the successful passage of Proposition One.  Idaho Code 67-429(B).

In sharp contrast to the mechanism in the SBT Compact, the three Northern Tribes have amendments to their Compacts that expressly provide for the singular machine game defined as "Tribal Video Gaming Device." Proposition One expressly clarifies that the TVGD is not a "slot machine" as that term is used in the Idaho Constitution. Idaho Code 67-429(B)(2). If the Compact Amendments are struck down, the Northern Tribes are left with the Compacts they signed in 1993, which do not include machine games.  *Coeur d'Alene v. Idaho*, 842 F. Supp. 1268 (D. Idaho 1994), *affirmed,* 51 F.3d 876 (9th Cir. 1995).

---

[3] SBT did NOT join the campaign for Proposition One. The decision was based in part because SBT foresaw the vulnerability of the TVGD to the exact challenge it now faces[3]. *See* Small Decl., ¶ 20.  Accordingly, SBT urged the Northern Tribes to include a non-house banked lottery device in the games to be approved by Proposition One. *Id.* The Northern Tribes refused. Although not opposing Proposition One, SBT sponsored a media campaign localized to southeastern Idaho clarifying that – Shoshone Bannock gaming is governed by the Tribe's recently negotiated, executed, and ratified compact, regardless of the outcome of Proposition One. *Id.*

[4] The Kootenai Tribe Compact Amendment was approved two years later.

In contrast, if the TVGD is struck down, Shoshone-Bannock simply defaults back to the same posture it was in before the lawsuit was settled: litigation over the scope of machine games, with the Tribe maintaining, modifying and eliminating its machine gaming as necessary to be consistent with the eventual Declaratory Judgment issued by the Court.[5] The most likely consequence to SBT of this Court striking down the TVGD will simply be to apply the terms of the SBT Compact to litigate or to negotiate machine games with different programming that is not of any consequence to players including Plaintiffs.[6] In sharp contrast, if the TVGD is struck down, the three Northern Tribes will not have a compact in place that provides for any type of machine gaming or otherwise provides any protection for the play of machine games.

Because these differences could have material adverse consequences to the three Northern Tribes that would not be applicable to Shoshone Bannock, or at a minimum, will be materially different for Shoshone Bannock, the Court should reconsider its Rule 19 analysis. When the United States is in the position of representing Tribes with materially conflicting interests, it cannot be found to be able to adequately represent the absent tribes for Rule 19

---

[5] If the Court holds that TVGD is valid because Idaho is able to compact for games otherwise prohibited by the Idaho Constitution, but Idaho is not required to compact for such games, see *Dalton v. Pataki,* 5 N.Y.3d 243, 835 N.E.2d 1180 (N.Y. 2005), the SBT Compact will still reach the TVGD because Idaho will have permitted the TVGD for "other tribes" , see *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003).

[6] Subsequent events demonstrate the viability of the Shoshone Bannock Tribes' legal position. Tribes in Washington State confronted a very similar circumstance. Like Idaho, Washington State expressly prohibited "slot machines" but expressly authorized a "Lottery." After litigation, *Washington v. Confederated Tribes of the Chehalis Reservation*, et al., C-95-1805-FVS, 20 Indian Law Rptr. 3124 (W.D. Wash. 1993) *See* Small Decl. Attachment D, in which the court ruled that a range of machine games is "permitted" gaming in Washington short of "slot machines", the Tribes and Washington State reached a settlement agreement that resulted in "Tribal Lottery Systems." The games are now offered, pursuant to compacts, at 28 tribal gaming facilities across the State. They are non-banked games. *See* Small Decl., Attachment E. Similar to the litigation path taken by Washington Tribes, Shoshone Bannock was prepared to pursue a judicial determination that the Tribe is entitled to offer a range of non-house banked, finite deal video gaming on its Indian lands. That effort was hijacked by Proposition One.

purposes. *Makah Indian Tribe v. Verity* 910 F.2d 555 (9th Cir. 1990); *Confederated Tribes of Chelahis v. Lujan*, 928 F.2d 1496 (9th Cir. 1991). The materially different legal positions of the tribes dramatically impacts the United States, which would run a substantial risk of incurring double, multiple, or otherwise inconsistent obligations in the event of an adverse judgment from this Court. *Makah,* 910 F.2d 555 at 559.

**B.    An Actual, Historic, and Inconsistently Applied, Conflict Exists between the United States' Trust Responsibility to the Tribes and the United States' Obligations to take Enforcement against Non-Compacted Class III Gaming.**

The United States' position regarding scope of games, or more specifically, regarding which games are "permitted" as that term is used in IGRA, is germane to both its IGRA and trust obligations to the Tribes and to its obligations to take enforcement action against non-compacted Class III gaming. In its Order, the Court expressly embraces these trust obligations as part of its analysis that the United States can adequately represent the Tribes. Order at 22 – 24 (the trust relationship in *Mitchell I* is applicable here).  The Court also acknowledges the United States' obligations to prosecute non-compacted Class III gaming as part of its analysis of redressability. Order at 18 - 20 (the Court is entitled to expect that federal prosecutors will follow the law if the Compacts are struck down). Those two obligations are inherently in conflict with one another, as demonstrated in the case law, and in the differing positions taken by the Office of the United States Attorney regarding tribal gaming in Idaho.

The Court surmised that if it "grants plaintiffs' requested relief, and strikes down the Compacts, there is no conflicting decision from the Ninth Circuit that might give prosecutors pause."  Order at 20. Remarkably, the United States failed to inform this Court of the dispositive case in the Ninth Circuit regarding enforcement against non-compacted Class III gaming: *Spokane Tribe v. United States,* 139 F.3d 1297 (9th Cir. 1998).

In *Spokane,* the United States sought and obtained an injunction against non-compacted Class III gaming, including slot machines, on the Spokane Tribe's Indian lands. The Ninth Circuit vacated the injunction, holding that enforcement action against non-compacted Class III gaming is inappropriate where a Tribe has done everything it is obligated to do to secure a compact and lacks a compact because a recalcitrant state fails to fulfill its good faith negotiation obligations under IGRA. *Id. Spokane Tribe* certainly is a "conflicting decision from the Ninth Circuit that might give prosecutors pause." Indeed, *Spokane Tribe* speculates as to the affirmative efforts the United States should take, including a policy of non-enforcement, to ensure that the Spokane Tribe is in the position Congress intended, but for Washington State's recalcitrance. *Spokane Tribe* at 1302. See also, *Texas v. United States,* 497 F.3d 491 (5th Cir. 2007) (concurring and dissenting Judges note that Kickapoo Tribe still has a statutory entitlement to offer Class III games and that appellate decision is simply limited to ruling that DOI-promulgated procedures are outside DOI's statutory authority. Other remedies suggested by the Fifth Circuit include the United States suing the recalcitrant state on the Tribe's behalf. *Texas v. United States,* 497 F.3d 491, 512, 517 (5th Cir. 2007).

As demonstrated above, striking down the TVGD does not resolve the issue of what gaming devices Tribes are entitled to offer in applying Idaho's authorization of the Lottery to IGRA's definition of "permitted" games. Enforcement action often turns on the resolution of that exact question. That was certainly the case in *Spokane Tribe.* Indeed, the question of the scope of "permitted" gaming under IGRA dominated this Court's own analysis in the 1995 litigation between the United States and the Shoshone Bannock Tribes.

On July 22, 1994, the United States Attorney for the District of Idaho informed the Shoshone Bannock Tribes that continued operation of the machine games in the absence of a

Compact would result in the U.S. Marshalls raiding the Tribe's gaming facility. That threat resulted in the Tribe filing a Declaratory Judgment Action against the United States that sought to enjoin the federal government from taking such enforcement action. *Shoshone Bannock Tribes v. United States,* No. CIV 95-0153-E-BLW *("Shoshone Bannock II").* A full blown evidentiary hearing was held before then-Magistrate Judge Williams with a large variety of machine games in front of him. On November 1, 1995, Magistrate Judge Williams entered his *Report and Recommendation and Order*, which concluded that Idaho law, applied to IGRA, clearly yields a range of viable machine games short of the traditional slot machine. Magistrate Judge Williams reasoned that the Shoshone Bannock Tribes had a substantial likelihood of prevailing in its IGRA bad faith litigation against the State. Accordingly, Magistrate Judge Williams recommended that the United States be enjoined from taking enforcement action against the Tribes as to certain video gaming devices[7].

As technology progressed, so did the machines in play on Indian lands in Idaho. The 1995 *Report and Recommendation* provides a snap shot in time where Magistrate Judge Williams found some games to be permissible Class II games, other games to be prohibited Class III games and his decision held that one video game, the Lucky Tab, was a permitted Class III game that Idaho is obligated to negotiate to include in a Compact pursuant to IGRA. Magistrate Judge Williams' concluded that the game outcome was based on a predetermined finite deal, just as pull tabs offered by the Idaho State Lottery. The mechanics of the Lucky Tab game, therefore, were in contrast to the random number generator used to determine winners in more traditional slot machines. (Doc. 51-5, Exh. 1, p. 8-9). Technology has since advanced such that a much

---

[7] Between the time of Magistrate Judge Williams' Report and Recommendation and Judge Winmill's consideration thereof, the *Seminole* decision came down. Accordingly, Judge Winmill concluded that SBT no longer had a substantial likelihood of prevailing in its IGRA litigation. See Memorandum Decision and Order, dated September 10, 1996.

greater variety of games that arguably meet Magistrate Judge Williams' analysis are available on the market and likely would be approved under the Shoshone Bannock Tribes' Compact if the TVGD is struck down.

Further complicating matters, the position of the United States regarding enforcement has historically turned on whether the Tribe has a Compact. Note that the United States did not threaten enforcement action against the Northern Tribes in 1994, even though they were offering the same games and they had lost in litigation as to whether the 1993 Compacts authorize machine gaming. The United States Attorney maintained that the difference was based on the fact that in 1994, only Shoshone Bannock did not have a compact with Idaho. *See* Small Decl., Attachment G -July 11, 2001 Editorial of former United States Attorney, Betty Richardson. She reasoned that it is the province of the State to seek enforcement against games in violation of the three Compacts with the Northern Tribes and decidedly not within the province of the United States. That position is at odds with the Court's December 27, 2010 analysis on redressability. The position regarding enforcement also changed, albeit to the Tribes' benefit, when then United States' Attorney Betty Richardson refrained from prosecuting against Shoshone Bannock gaming while it was at the negotiation table with the State in the wake of the Batt Commission's Majority Report. *Id.*

The United States appears to have now switched that position yet again because the United States is not correcting this Court's December 27, 2010 assumptions regarding redressability even though it has been reminded by Shoshone Bannock of the United States' stated position that it is the province of the State, and not the United States, to seek enforcement against non-compacted Class III gaming in circumstances where a compact is in effect. If that position is correct and consistently applied, then an Order of this Court striking the Northern

Tribes' Compact Amendments, will cause the governance of their gaming to revert back to the original 1993 Compacts, the enforcement of which, according to the United States in 2001, is the province of the State. If this Court agrees with the United States on that point, then it should reassess its redressability analysis of Plaintiffs' Complaint and dismiss the lawsuit on that ground regardless of how it resolves the other issues raised in this amicus brief.

In applying the Rule 19 case law to these facts, *Cherokee Tribe v. Babbitt,* 117 F.3d 1489 (D.C. Cir. 1997) is instructive. The lawsuit challenged the United States' decision to provide formal federal recognition of the Delaware Tribe. The District Court dismissed on Rule 19 grounds noting that the history of United States position vis-à-vis the formal recognition of the Delaware was volatile and inconsistent such that United States was unable to adequately represent the Tribe. The D.C. Circuit affirmed that part of the analysis, but reversed on other grounds, concluding that the Delaware Tribe was not a federally recognized tribe and therefore not able to assert sovereign immunity. Regarding the Rule 19 analysis, the D.C. Circuit reasoned:

> Here, although the Delawares and the Department currently take the same position regarding the Delawares' sovereignty, and to that extent their interests are the same, the Department has twice reversed its position regarding the Delawares since 1940. Given the procedure used to reach the Final Decision at issue, the Department may reverse itself again. Moreover, even were the Department vigorously to represent the Delawares vis-a-vis the Cherokee Nation in the district court, the Department might decide not to appeal any unfavorable decision. As a non-party, the Delawares would have no right to appeal, regardless of whether the Department's decision was based on its view of the merits or on other considerations. The Delawares' ability to participate as an amicus curiae is thus insufficient to protect their interests.

*Id.* at 1497. In the instant case, the United States' position regarding enforcement against tribal gaming has changed at least twice regarding Shoshone Bannock gaming specifically, and has been inconsistently applied in other jurisdictions over the course of the twenty year history since

Congress' passage of IGRA. As in *Cherokee Nation v. Babbit,* even if the United States vigorously defends the legality of the TVGD, it may decide not to appeal. *Id.*

*Manygoats v. Kleppe*, 558 F.2d 556 (10th Cir.1977) is also instructive. In *Manygoats,* seventeen members of the Navajo Nation sought APA review of the Secretary's approval an agreement between Exxon and the Navajo Nation. In analyzing whether the absent-party Navajo Nation was necessary and indispensible, the D.C. Appeals Court reasoned:

> In the instant case the duties and responsibilities of the Secretary may conflict with the interests of the Tribe. The Secretary must act in accord with the obligations imposed by NEPA. In acting upon the Navajo-Exxon agreement the Secretary, to further the national objectives declared by NEPA, must have and consider an EIS. The national interest is not necessarily coincidental with the interest of the Tribe in the benefits which the Exxon agreement provides. When there is a conflict between the interest of the United States and the interest of Indians, representation of the Indians by the United States is not adequate.

*Id*. at 558. In the instant case, the duties and responsibilities of the United States regarding prosecution of allegedly illegal tribal gaming activities do not necessarily coincide with the interests of the Tribes. Accordingly, "representation of the Indians by the United States is not adequate." *Id.*

Underscoring this argument is the fact that the United States did not join in the argument or seek reconsideration on these grounds. The information regarding the differences among the Tribes and regarding the enforcement policy positions of the United States Attorney for Idaho is material to the Court's Rule 19 analysis, is known or should be known by the Department of Justice and the Office of the United States Attorney, yet the United States has failed to provide the Court with this critical information. When, in the context of its Rule 19 analysis, the Court considers whether the United States can provide a single argument that the absent Tribes would raise and the United States would not, this argument provides a case-in-point. As set forth in the

next subsection C, this argument is one of several arguments that the absent Tribes would make that the United States would not.

### C. The Conflicts that Render the United States Incapable of Adequately Representing the Tribes is also Manifested in the Arguments it may or may not Make on the Merits of Plaintiffs' Claims Regarding the Constitutionality of Proposition One.

As demonstrated above, the scope of "permitted" gaming under IGRA becomes an essential argument in any federal enforcement action against non-compacted Class III gaming. This Court stresses in its December 27, 2010 analysis on redressability that it expects federal authorities to prosecute if it does strike down the TVGD. Accordingly, one reasonably wonders if the United States will make the same arguments that the absent Tribes would present, and make them as well. The Court's December 27, 2010 analysis poses the question and answers it affirmatively. Order at 12. SBT does not have the same confidence in the adequacy of the United States' representation to protect the Tribes' interests, particularly when positions taken on the merits may compromise the positions taken by the United States when prosecuting unlawful tribal gaming activities.

To flush these issues out, in the wake of the Order, Shoshone Bannock sought clarification from the United States regarding the arguments it will make if this case goes forward on the merits. Shoshone Bannock set forth a brief summary of four primary arguments it would advance if it were not absent from this lawsuit and the lawsuit proceeds on the merits. *See* Small Decl., Attachment H. In its February 24 Response, the United States fails to confirm or deny that it will make any of the four arguments advanced by Shoshone Bannock. *See* Small Decl., Attachment I. The United States made it clear that the "interests" the United States seeks to protect in the litigation are not necessarily the interests of SBT. *Id.* Further, the United States

made clear it is "not obligated" to pursue the arguments set forth in by SBT. *Id.* The February 24, 2011 response attached a 1979 Memorandum that addresses the very type of potential conflict we have here:

> Where there are other statutory obligations imposed on the Executive in a particular case aside from those affecting Indians, faithful execution of the laws require the Attorney General to resolve these competing or overlapping interests to arrive at a single position of the United States.

*See* Small Decl., Attachment I, Exh. B, p. 3-4. Application of that standard to each of the arguments below yields competing and overlapping interests of the United States such that the federal defendants are not capable of adequately representing Shoshone Bannock's interests.

First, "slot machine" is not a defined term in the Idaho Constitution. Use of the term varies widely within the industry and across multiple jurisdictions. The TVGD has finite restrictions on the medium of display and the dispensing of coin or currency that distinguish it from traditional or classic slot machines. Accordingly, deference should be given to a clarification made by the People of Idaho that the TVGD is not a slot machine. *League of Women Voters of California v. McPherson,* 145 Cap.App.4[th] 1469, 1481, 52 Cal.Rptr.3d 585, 594 (Cal. App. 2006); *Schecter v. Killingsworth,* 380 P.2d 136, 142 (Ariz. 1963). The position of the United States necessarily would be tempered by its competing and overlapping interests in prosecuting federal criminal and civil forfeiture laws regarding gaming devices. *North Beach Amusement Co. v. U.S.*, 240 F.2d 729 (4th Cir. 1957); *U.S. v. Twelve Miami Digger Slot Machines,* 213 F.2d 918 (5th Cir. 1954); *U.S. v. One Hundred Thirty-Severn (137) Draw Poker-Type Machines,* 606 F. Supp. 747 (D.C. Ohio, 1984).

Second, an adverse judgment against the TVGD would, pursuant to the provisions of the Shoshone Bannock Compact, simply lead to machines programmed differently, but no less vulnerable to pathological gambling. Moreover, Shoshone Bannock would further argue that if it

failed to establish that Class III machine gaming is available pursuant to the Compact, the Tribes would still be able to offer Class II gaming devices.[8] Whether the end result is TVGDs, Tribal Lottery systems, Class II devices, or some other form of Video gaming, Plaintiffs will be vulnerable to pathological gaming available on the Fort Hall Reservation. Whether the United States will make this argument, applying its own standard, requires an inquiry as to whether it yields competing and overlapping interests in litigation over whether or not a device is Class II gaming. Indeed, the Department of Justice has often been on the side of advocating a narrow definition, *Seneca-Cayuga Tribe of Oklahoma v. National Indian Gaming Com'n,* 327 F.3d 1019, 1032 (10th Cir. 2003); *U.S. v. 103 Electronic Gambling Machines,* (9th Cir. 2000), and in at least one instance, DOJ and NIGC took competing positions in the same litigation. *U.S. v. Santee Sioux Tribe of Nebraska,* 135 F.3d 558 (8th Cir. 1998).

The Tribe advanced two additional arguments in its letter to DOJ: (a) that the State may include in Tribal gaming compacts games that are completely "prohibited" by the laws of the State, even if prohibited by the terms of the State Constitution and (b) that the Idaho Constitutional Prohibition on slot machines does not apply to Indian lands because Idaho's Constitution, by its express terms, does not extend to Indian lands. Although, at this juncture, it is not apparent that advocating those two arguments will yield overlapping and conflicting interests, it remains disconcerting that the United States will not confirm that such arguments will be advanced. That failure to confirm, whether standing along, or considered along with the

---

[8] Class II gaming device play represents an important, economically significant segment of annual Indian gaming revenues. *See* Small Decl. Attachment J. Class II gaming device technology has advanced tremendously and undergone many adaptations such that the games are now a viable alternative to Class III games, and accordingly, are no less vulnerable to pathological gaming. *Id.*

evidence and arguments presented above should cause this court to conclude that the United States is incapable of adequately representing SBT's interests.

### D. All Claims Should be Dismissed as Time-Barred.

Shoshone Bannock agrees with the United States in its Motion for Reconsideration that the Court should rule that the Plaintiff Knox' action is not timely. However, Shoshone Bannock urges this Court to rule that both Plaintiffs Knox and Dotson's claims are time barred. If the Court's Statute of Limitations ("SOL") analysis turns on when Knox and Dotson began play in gaming facilities on the Tribes' Reservation, then Knox' claims are untimely based on her own attestations and limited discovery will likely reveal that Dotson's play also predates April, 2003. The Court's SOL analysis, however, appears to turn on the date TVGDs first become available on the Fort Hall Reservation. The Court reasoned:

> However, as will be discussed further below, the only reason the Tribes brought video gaming to Fort Hall was that the Secretary approved the amendments of the northern tribes, triggering the most-favored-nation provision of the Tribes' compact

Order at 20. In reality, SBT has been offering video gaming at Fort Hall since 1992 and continuously has operated a steadily increasing number of video gaming devices through the present. (Doc. 51-5 at ¶24). Two snapshots in time demonstrate that video gaming has been present on the Fort Hall Reservation in 1995 and again in 1997. In 1995, this Court itself noted the fact in *Shoshone Bannock Tribes v. United States,* No. CIV 95-0153-E-BLW *("Shoshone Bannock II)* Slip op. at pp. 1- 2. (the Shoshone Bannock Tribes "has been operating a number of different types of pull tab games" including "wildfire" machines, an "eight line type device" and a "video display device"). In 1997, the Majority Report of the Gaming Study Committee for the Governor of Idaho found Tribal gaming in Idaho then consisted of "video lottery terminals, video lotto pull tables and video scratch off games." (Doc. 51-5 Exh. 2).

The United States failed to present this information to the Court in the pleadings considered for the Court's December 27, 2010 Order, providing yet another example of the federal defendants' inability to adequately represent the interests of SBT. Providing the true facts regarding the availability of TVGDs to both Plaintiffs Knox and Dotson should cause this Court to now dismiss the lawsuit on SOL grounds.

**E. All Claims are now Moot, because Plaintiffs are Permanently Excluded from SBT Gaming Facilities.**

As set forth in the United States brief (Doc No. 51-5 pp 6-15) Plaintiffs Wendy Knox and Richard Dotson are excluded from gaming facilities on the Fort Hall Reservation pursuant to long-standing provisions of Shoshone Bannock Tribal law and regulations. Whatever the correctness of the Secretary's approval of the Northern Tribes' compact amendments, due to their permanent exclusion Plaintiffs will not be allowed to enter STB gaming facilities. SBT concurs in that analysis and argument. Had the United States properly consulted the Tribes prior to filing the pleadings that lead to the December 27, 2010 Order, they would have learned of the Tribes' actions regarding exclusion. Their failure to do so provides another case-in-point of the federal defendants inability to adequately represent SBT's interests.

**III. CONCLUSION**

Three separate grounds for revisiting the Court's determination that the United States can adequately represent the interests of the absent Shoshone Bannock Tribes are established by this amicus brief. First, the substantial differences between the Shoshone Bannock Compact and those of the Northern Idaho tribes result in divergent interests between the Tribes such that the United States cannot adequately represent the Tribes. Second, the conflicting and inconsistent positions of the United States regarding enforcement action against non-compacted Class III gaming renders the United States incapable of adequately representing the Tribes. Third, the

United States' failure to seek reconsideration of the Court's Rule 19 analysis and failure to confirm that it will advance several key arguments that would be advanced by the absent Shoshone Bannock Tribes renders the United States incapable of adequately representing the Tribes. Because amicus Shoshone Bannock is a necessary and indispensible party to this litigation that cannot be joined due to its sovereign immunity, this Court lacks subject matter jurisdiction over all claims and this case should be dismissed.

Additionally, the claims are time-barred because Plaintiffs were able to play TVGDs at gaming facilities on the Fort Hall Reservation since the late 1990s, well before the Secretary's approval of the Compact Amendments for the Northern Idaho Tribes. Finally, this case is moot given the Tribe's permanent exclusion of Plaintiffs from Fort Hall gaming facilities.

Accordingly, this Court should vacate its Order of December 27, 2010 and issue an Order dismissing the litigation, in its entirety.

Dated this 10th Day of March, 2011.

/s/ William Bacon
William Bacon
General Counsel for the Shoshone Bannock Tribes
P.O. Box 306
Ft. Hall, Idaho 83203
Phone: (208) 478- 3822
E-Mail: bbacon@sbtribes.com

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of March, 2011, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court EM/ECF System.


Curt R. Thomsen email address: cthomsen@custertel.net

T. Jason Wood email address: tjwood@thomsenstephenslaw.com

Clay R. Smith email address: clay.smith@ag.idaho.gov

Ty Bair email address: tyler.bair@usdoj.gov

Samantha Klein Frank: Samantha.klein@usdoj.gov


By: /s/ William Bacon
William Bacon